**C. Fink FISCHER et al., Plaintiffs,**

v.

**NEW YORK STOCK EXCHANGE and Aubrey B. Lank, as the Receiver for Pickard & Company, Incorporated, Defendants.**

**No. 75 Civ. 1638.**

United States District Court, S. D. New York.

Jan. 15, 1976.

John M. Burns, III, New York City, for plaintiffs.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant New York Stock Exchange, Inc.; Russell E. Brooks, Martha G. Bannerman, New York City, of counsel.

Spengler, Carlson, Gubar & Churchill, New York City, for defendant Aubrey B. Lank; Robert S. Carlson, New York City, of counsel.

LASKER, District Judge.

This is an action by four subordinated lenders (the lenders) of Pickard & Company, Inc. (Pickard), a defunct brokerage firm, against the New York Stock Exchange (the Exchange), of which Pickard was a member, and Aubrey B. Lank, Receiver of Pickard. The complaint alleges that Pickard was guilty of securities law and common law fraud in the solicitation and renewal of the subordinated loan agreements. The Exchange is charged in three counts with securities fraud,[1] aiding and abetting Pickard's fraud and breaching its contract with the Securities Exchange Commission entered into pursuant to § 6(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(f)(a)(1) (1971), by which the Ex-change undertook to comply with the securities laws and to enforce compliance by its members. Jurisdiction is predicated on § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1971), § 22 of the Securities Act of 1933, 15 U.S.C. § 77v (1971), and on diversity of citizenship.

Two motions are now before the court. The lenders seek to stay an arbitration proceeding in which they and Lank are currently engaged to resolve a dispute over entitlement to the subordinated accounts. The Exchange, asserting a variety of infirmities in the lenders' allegations against it, moves to dismiss the complaint or for summary judgment and, alternatively, to strike certain portions of the complaint.

I.

At various times in 1966, each of the four plaintiffs deposited assets in customer accounts at Pickard and entered written agreements which subordinated their rights to the assets to those of other creditors of Pickard. In connection with these transactions each plaintiff also acquired non-voting stock of Pickard. Throughout the period from 1966 to early 1968, the plaintiffs agreed to extend the subordination agreements each time they became due to expire. The last extension was agreed to in January, 1968, when the agreements were about to expire on February 1. The affairs of Pickard were then in serious disarray, and its solvency was in question. Independent accountants had attempted unsuccessfully to complete an audit of Pickard's books since the fall of 1967. The lenders were told of this situation and were also told that without their accounts, Pickard would be forced to go out of business. They consented to extend the agreements to March, 1968.

The continued use of the lenders' accounts, however, failed to prevent disaster, and in February the decision to

1. The complaint alleges violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1971), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1975).

liquidate Pickard was made. The subordination agreements provided that in the event of liquidation the lenders would not be entitled to share in the distribution of Pickard's assets until the claims of all general creditors were satisfied. Since the ability of Pickard to pay its debts was still uncertain and the answer hinged on the outcome of further auditing procedures, the lenders executed further agreements under which their assets were delivered to a custodian to be held until the question of entitlement could be resolved. The custodian agreements provided that in the event Pickard and the lenders could not agree which of them was entitled to the assets, the dispute would be resolved by arbitration.

Pickard served a demand for arbitration on February 18, 1969. The first hearing, however, was not held until April 25, 1974. Since that time there have been two further hearings, the latest on March 25, 1975. At that hearing, and in the course of preparation for it, the lenders for the first time came into possession of the information which provides the basis for their allegations of wrongdoing against both defendants. Pursuant to a subpoena they obtained a memorandum to the Exchange's Board of Governors dated July 25, 1968 which contains a summary of charges brought against various officers of Pickard in the wake of its final collapse. This document establishes that Pickard had a history of noncompliance with SEC and Exchange rules extending as far back as July, 1965. The Exchange was well aware of Pickard's problems. No less than four disciplinary actions were taken, three by the Exchange and one by NASD from January, 1966 to March 1967, and a variety of trading restrictions and sanctions were imposed on Pickard as a result. (Burns Affidavit, September 16, 1975; Exhibit A; (Exchange Memo) at 4–7)

Lloyd W. McChesney, the former Chief Examiner of the Exchange and the man who served as Liquidator of Pickard, was called to testify at the March 25th arbitration hearing and the lenders questioned him on the contents of the newly discovered memorandum. The following exchanges occurred:

"Q Do you know whether there has been any disclosure to the public that Pickard & Company had been censured and warned?

A I think it was rare at that time that any kind of activity was published.

Q Was it just kept in the house with the Board of Governors?

A It would have been. The Board of Governors, the Exchange staff, who were interested interested (sic) in that particular area and the firm itself, of course.

* * * * * *

Q If you were an accountant advising an investor, would you consider this restriction in how to advise the investor?

A Yes.

Q It would make a difference whether you would recommend an investment; couldn't it? Certainly would influence a decision and would be a negative influence, would it not?

A Absolutely."

(Burns Affidavit, September 16, 1975; Ex. B (Arbitration Transcript) at 229, 248). The lenders interpret the thrust of McChesney's testimony to be that it was the policy of the Exchange not to disclose information about disciplinary action and restrictions against members to the investing public and that such information, in the case of Pickard, would have had a materially adverse impact on an investor's decision to become a subordinated lender in the firm.

The complaint in this action was filed on April 8, 1975, two weeks after McChesney testified. Pickard is charged with securities law and common law fraud for inducing the lenders to execute the subordination agreements and the extension agreements without disclosing its violations of SEC and Exchange rules and the sanctions and restrictions under which it operated. The Exchange is charged with complicity in Pickard's

fraud, based primarily on its knowledge and approval of the lenders' applications to enter the subordination agreements and its alleged policy of nondisclosure. The lenders also claim that the Exchange directly participated in the fraudulent omission in the January, 1968 transaction in which the lenders agreed to a final extension of their loan agreements, because it was a Vice President of the Exchange who personally prevailed upon them to extend. In a separate count the Exchange is charged, on the basis of the same allegations, with aiding and abetting Pickard's fraud. Finally, the lenders assert that the Exchange breached its contract with the SEC in which it promised to enforce compliance by its members with securities laws, as well as SEC and Exchange rules. From Lank, in his capacity as Receiver of Pickard, the lenders seek rescission of the loan agreements with Pickard. Both actual and punitive damages are sought from the Exchange.

## II.

### The Motion for a Stay of Arbitration

The lenders maintain that under *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) they are entitled to a stay of the arbitration proceeding pending the determination by this court of their newly discovered securities law claim. Lank counters that the agreements to arbitrate are contained in the custodian agreements which were executed in March, 1968, at which time a dispute over the right to possession of the funds had already arisen. He takes the position that the lenders are bound by their decision to submit to arbitration which they made with full knowledge of the existence of a controversy.

In *Wilko v. Swan, supra,* the Supreme Court held that an agreement to arbitrate *future* disputes arising under the Securities Act of 1933 is not enforceable. Such an agreement was held to be a stipulation waiving compliance with § 22(a) of the Act, 15 U.S.C. § 77v(a) (1971), which grants plaintiffs a wide choice of forum, and therefore to run afoul of the non-waiver provision of § 14.[2] It has been widely held that the rationale of *Wilko* applies as well to suits under the Securities Act of 1934. *Moran v. Paine, Webber, Jackson & Curtis,* 389 F.2d 242, 245 (3d Cir. 1968); *Starkman v. Seroussi,* 377 F.Supp. 518, 522 and n. 20 (S.D.N.Y.1974) (Weinfeld, J.); and see *Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178, 183 n. 5 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). But see, *Sherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).[3]

*Wilko*, however, does not create a flat proscription against the resolution of *all* securities laws claims by arbitration. If, once a controversy has arisen, a party voluntarily submits or agrees to submit to arbitration, he is bound by his decision. *Moran v. Paine, Webber, Jackson & Curtis, supra,* 389 F.2d 242; *Gardner v. Shearson, Hammill & Co.,* 433 F.2d 367 (5th Cir., 1970), *cert. denied,* 401 U.S. 978, 91 S.Ct. 1209, 28 L.Ed.2d 329 (1971); *Reader v. Hirsch & Co.,* 197 F.Supp. 111, 117 (S.D.N.Y.1961). Cf. *Coenen v. R. W. Pressprich & Co.,* 453 F.2d 1209, 1213 (2d Cir. 1972), *cert. denied,* 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972).

The issue to be determined on this motion, then, is whether the custodian agreements entered into by the lenders and Pickard in March, 1968, were executed before or after the dispute came

---

**2.** § 14, Securities Act of 1933, 15 U.S.C. § 77n (1971) provides that:

"Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this sub-chapter or of the rules and regulations of the Commission shall be void."

**3.** In *Sherk v. Alberto-Culver Co., surpa,* the Supreme Court noted in passing a basis for

distinguishing between the two Acts on this issue. 417 U.S. at 513–14, 94 S.Ct. 2449. Yet the question was not raised by the parties to this motion. Although we are inclined to view the similarities between the two Acts as greater than their differences, it is unnecessary to decide the issue because the lenders assert a claim against Pickard under the '33 Act as well as the '34 Act. See note 1, *supra.*

into existence as that phrase is used in *Wilko* and the later cases. The lenders contend that they are entitled to a stay of arbitration, because at the time they agreed to arbitrate they had no knowledge that a securities law claim existed, and, in fact, sought the stay promptly upon learning of it. Lank retorts that the arbitration clauses by their terms encompass all matters relating to entitlement to the assets in the subordinated accounts, and since a dispute on that matter existed at the time the agreements were made, the agreements do not relate to a future controversy, but to one "which has already ripened." (Memorandum in Opposition to a Stay, at 6).

 Lank's position disregards the rationale of the *Wilko* line of authority. The cases are concerned with preservation of plaintiffs' rights under the securities laws, and therefore, it is knowledge of a securities controversy, not knowledge of a dispute of another nature, which is crucial to a determination of when the controversy arose. At the time they agreed to arbitrate, the lenders knew there was a disagreement about Pickard's financial ability to meet its obligations without the use of their accounts. But since they "had no idea [they] had been defrauded . . . there was no existing dispute, the resolution of which by a court [they] might have waived." *Laupheimer v. McDonnell & Co., Inc.*, 500 F.2d 21, 25 (2d Cir. 1975). See *Lawson Fabrics, Inc. v. Akzona, Inc.*, 355 F.Supp. 1146, 1150 (S.D.N.Y.1973); *Reader v. Hirsch & Co., supra,* 177 F.Supp. 111, 116.[4]

Accordingly, the motion to stay arbitration is granted.

## III.

### *The Exchange Motion to Dismiss or for Summary Judgment*

The Exchange raises a number of challenges to the allegations against it. It demands judgment as a matter of law with regard to the charge of complicity in Pickard's fraud, because it maintains that under the circumstances alleged it had no duty of disclosure. It also questions the materiality of the alleged omissions, the connection between the omissions and the purchase or sale of securities, the lenders' compliance with Rule 9(b), Fed.R.Civ.P., and the propriety of the prayer for punitive damages. Finally, the Exchange argues that the statute of limitations has run on the third count, which is based on § 6 of the Securities Exchange Act of 1934.

We conclude that the complaint states a claim for relief and decline to grant summary judgment on the two counts of fraud. The Exchange raises substantial questions of liability which may well prove meritorious, but it would be premature to attempt to determine them before the lenders have had an opportunity for discovery and, possibly, before a trial of the issues. We agree, however, that the prayer for punitive damages should be stricken and that the statute of limitations bars assertion of the § 6 claim.

### A. *Duty*

The Exchange strenuously urges that on the facts pleaded in the complaint, it cannot be found liable under Rule 10b-5 because it had no duty of disclosure. The Exchange is charged both as a principal in and as an aider and abettor of Pickard's fraud almost exclusively on the basis of participation in an alleged con-

---

**4.** Lank's suggestion at the tail end of his brief that the complaint should be dismissed for the lenders' failure to secure permission to sue from the Delaware Court which appointed him Receiver of Pickard is improperly before the court. Such an issue must be raised by motions, properly supported. The short answer to the claim, however, is that the requirement of prior leave to sue a receiver does not apply where, as here, the subject of the suit is one over which the federal court has exclusive jurisdiction. *Hupfeld v. Automaton Piano Co.,* 66 F. 788 (C.C.S.D.N.Y.1898). And see *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia,* 311 F.Supp. 149, 160–61 (S.D.N.Y.1970).

spiracy of silence to withhold negative information about its members from the investing public and from those who, like the plaintiffs here, invest in member firms. (Complaint ¶ 29) It is the passive nature of its alleged involvement in the fraud which forms the basis for the Exchange's contention. The Exchange maintains that because it was not a party to the lenders' transactions with Pickard, and its alleged wrongdoing consisted solely of inaction, no duty to disclose could have arisen.

■ At the outset it is to be noted that the Exchange's argument overlooks the fact that it is charged with direct involvement in at least one episode of non-disclosure. (Complaint ¶ 35) The averment, as fleshed out by the submissions on this motion, is that it was a Vice President of the Exchange, Robert M. Bishop, who personally encouraged the lenders to make the final renewal of their loan agreements in January, 1968. In its Reply Memorandum the Exchange challenges the materiality of the alleged non-disclosure at that juncture. Whatever the merit of this contention, see B, *infra*, the Exchange cannot gainsay a duty to disclose facts material to the lenders' decision to extend their subordinated loan contracts when it directly participated in the solicitation of the extension.

Therefore, even if we could agree with the Exchange that there was no duty of disclosure as to the facts otherwise alleged, we could not dismiss the complaint in its entirety on the ground of absence of duty.

■ Apart from this single instance of alleged direct involvement in the lenders' transactions with Pickard, the complaint asserts liability against the Exchange which has elsewhere been termed "secondary," *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1289 (2d Cir. 1973), that is, as a conspirator or an aider and abettor.[5] The question whether such secondary liability can attach, and specifically whether a duty to disclose might exist, absent some affirmative action in aid of the primary wrongdoer is one on which a difference of opinion has been expressed in the few cases which have considered it. Compare, e. g., *Hochfelder v. Midwest Stock Exchange,* 503 F.2d 364 (7th Cir.), *cert. denied,* 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974) and *Brennan v. Midwestern United Life Insurance Co.,* 259 F.Supp. 673 (N.D.Ind. 1966) (denial of motion to dismiss), 286 F.Supp. 702 (1968) (on the merits), *aff'd,* 417 F.2d 147 (7th Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970), with *Wessel v. Buhler,* 437 F.2d 279 (9th Cir. 1971). We conclude that the sounder view is that a duty to disclose may arise in some circumstances, including perhaps, those pleaded in the complaint, solely on the basis of a failure to act. The motion to dismiss on this ground is therefore denied. Summary judgment is also denied because the existence of such a duty is a question of fact which cannot be answered at this stage of the proceedings.

One of the first opinions to consider the elements of liability for aiding and abetting securities fraud is *Brennan v. Midwestern United Life Insurance Co., supra,* 259 F.Supp. 673. There the defendant was alleged to have assisted the fraud of a brokerage firm which dealt in shares of Midwestern, by permitting known manipulative activities to continue without reporting the violations to

---

5. *In the remainder of this section we confine our discussion to liability as an aider and abettor. If, by Paragraph 29, the lenders intend to plead liability as a conspirator as a separate basis for relief, such a theory would seem clearly to require the commission of at least one overt act in furtherance of the conspiracy. See* Ferguson v. Omnimedia, Inc., *469 F.2d 194, 197 (1st Cir. 1972);* Herpich v. Wilder, *430 F.2d 818, 819 (5th Cir. 1970), cert. denied,*

401 U.S. 947, 91 S.Ct. 935, 28 L.Ed.2d 230 (1971); *Dasho v. Susquehanna Corp.,* 380 F.2d 262, 267 n. 2 (2d Cir. 1967). In view of the allegation of direct participation in the episode of January, 1968 and our determination not to dismiss the count of aiding and abetting, however, the lenders will have an opportunity for discovery which may or may not develop evidence of such acts.

the SEC. On a motion to dismiss Midwestern raised the objection asserted here by the Exchange and the motion was denied. Abiding by the Restatement's definition of aiding and abetting,[6] the court concluded that:

"Certainly not everyone who has knowledge of improper activities in the field of securities transactions is required to report such activities. This court does not purport to find such a duty. Yet, duties are often found to arise in the face of special relationships, and there are circumstances under which a person or corporation may give the requisite assistance or encouragement to a wrongdoer so as to constitute an aiding and abetting by merely failing to take action." 259 F.Supp. at 681–82.

After trial the court found Midwestern liable but was not required to rule on the existence of liability for inaction alone because it found that Midwestern had committed affirmative acts in support of the broker's deception. 286 F.Supp. 702. On this basis the Court of Appeals for the 7th Circuit affirmed. 417 F.2d 147 (1969).

In *Wessel v. Buhler, supra*, 437 F.2d 279, the 9th Circuit declined to hold an accountant liable for the use in a prospectus of figures from two unaudited financial statements he had prepared, where there was no evidence that he participated in the preparation of the prospectus itself. In response to the assertion that the accountant aided and abetted the violation because he owed a duty to prospective investors in the company to disclose his knowledge of the irregular financial conduct and inadequate records of the corporation, and his failure to do so enabled the company president to make fraudulent use of the figures in the prospectus, the court commented "There is not a scrap of authority supporting this extraordinary theory

of Rule 10b–5 liability, and we will not supply any in this case. We find nothing in Rule 10b–5 that purports to impose liability on anyone whose conduct consists solely of inaction." 437 F.2d at 283.

The 7th Circuit was again confronted with the question in *Hochfelder v. Midwest Stock Exchange, supra*, 503 F.2d 364, a suit which is in some ways parallel to the instant action. There defrauded customers of a broker-member of the defendant Midwest Exchange (Midwest) sought recovery against Midwest both under § 6 and as an aider and abettor of the broker's 10b–5 violation. The court affirmed the district court's grant of summary judgment to Midwest, but in doing so also affirmed the conclusion of the court in *Brennan* that inaction alone might, in some circumstances, provide a basis for liability. In explicitly rejecting the conclusion of *Wessel*, the court stated:

"Keeping in mind the frequent admonition of the Supreme Court that courts must be alert to provide such remedies for securities frauds as to make effective the Securities Acts, . . . we are not prepared to hold that a claim for aiding and abetting solely by inaction cannot be made under Rule 10b–5. In invoking such a rule, however, we would not go so far as to charge a party with aiding and abetting who somehow unwittingly facilitated the wrongful acts of another. Rather, to invoke such a rule investors must show that the party charged with aiding and abetting had knowledge of or, but for a breach of duty of inquiry, should have had knowledge of the fraud, and that possessing such knowledge the party failed to act due to an improper motive or breach of a duty of disclosure." 503 F.2d at 374. (citations omitted)

---

**6.** Restatement, Torts § 876 (1939) provides:

"For harm resulting to a third person from the tortious conduct of another, a person is liable if he

\* \* \* \* \* \*

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."

Summary judgment was granted to Midwest not because of a legal infirmity in the plaintiff's theory, but because the court found that Midwest had no knowledge of the fraudulent scheme and had adequately met its § 6 duty to inquire with no reason to know or suspect the broker's fraudulent scheme. Since the plaintiffs' case fell on the first branch of the test enunciated, the court did not analyze the duty of disclosure owed by a stock exchange to the customers of its members.

No cases in the Second Circuit provide direct guidance in this uncharted area, but *Lanza v. Drexel & Co., supra,* 479 F.2d 1277, decided before *Hochfelder,* is of interest. In *Lanza* the court discussed the possible liability of an outside director, Coleman, for violations of which he was unaware. Because Coleman was not alleged to have been directly involved in the fraudulent acts, the court's analysis necessarily included a consideration of the elements of secondary theories of liability. 479 F.2d at 1299–1306. The principal focus of the court's concern was the mental element of the offense, and the holding of *Lanza* is that *scienter* of a degree at least greater than negligence is a necessary predicate to 10b–5 liability. *Id.* at 1304–05. The court's discussion, however, does not preclude the possibility that liability for aiding and abetting might attach on the basis of inaction alone, providing the requisite *scienter* exists.[7] In fact, the opinion quotes approvingly the crucial passage from *Brennan,* quoted at 12–13, *supra,* which rejects the contention that an affirmative act is required. *Id.* at 1303.

The conclusion to be drawn from the decisions in *Brennan, Wessel, Hochfelder* and *Lanza* is that the precise scope and nature of a non-participant's liability under Rule 10b–5 remains fluid. The premise of *Hochfelder* and *Brennan* that in some instances a duty of disclosure might exist such that silence, and nothing more, would constitute substantial assistance or encouragement amounting to an aiding and abetting is persuasive. If the allegations of the complaint are true, this is arguably such an instance. The complaint plainly states a claim of fraud against Pickard, the primary wrongdoer. (¶¶ 6–27) See *Lanza v. Drexel, Co., supra,* 479 F.2d at 1303. It further alleges that the Exchange agreed with its members to conceal from investors in its members facts derogatory to the members' reputations, and pursuant to that agreement concealed the history of Pickard's violations and the restrictions under which it operated from the plaintiffs, (¶¶ 29–30), despite full knowledge that they had invested in Pickard. (¶ 31) *Scienter* is sufficiently pleaded in the allegation that the Exchange knew or should have known that the lenders were unaware of the dismal facts. (¶ 31) Under the circumstances there may have been a duty to disclose. Duty, it is apparent, is a function of relationship, see *Brennan, supra,* 259 F.Supp. at 681–82, a question which raises subtle factual issues which go beyond the face of the pleadings.[8]

Mindful of the admonition that summary judgment should be employed with caution where complex or novel issues of law or of mental operations are raised, *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), it would be improper at this stage of the proceedings to hold that the lenders could prove no facts under which the Exchange would have had a duty to disclose the information to

7. *Contra, Seligson v. New York Produce Exchange,* 394 F.Supp. 125, 138 n. 14 (S.D.N.Y. 1975).

8. We note in passing that this question provides a significant distinction between the allegations of the lenders and those of the plaintiffs in *Wessel.* The relationship of an accountant who has made no public representations about his figures to investors, compare, e. g., *Gold v. DCL, Inc.,* CCH Sec.L.Rep. ¶ 94,036 at 94,167–68 (S.D.N.Y.1973) with *Fischer v. Kletz,* 266 F.Supp. 180 (S.D.N.Y.1967), is entirely different from that of the Exchange to people who intend to invest in its member firms.

them.[9] The question is difficult because it is clear that the Exchange, a public or quasi-public authority, is caught between conflicting loyalties and obligations.[10] Moreover, the basis for the lenders' allegations here is far from overwhelming. They have a long road to travel before establishing that the Exchange owed them a duty of disclosure, but they are entitled to an opportunity to develop more fully the facts of the Exchange's relationship, both with Pickard and with themselves, before a definitive ruling on this question is reached. *Brennan, supra,* 259 F.Supp. at 682; *Fischer v. Kletz,* 266 F.Supp. 180, 197 (S.D.N.Y. 1967); *Lewis v. Marine Midland Grace Trust Co.,* 63 F.R.D. 39, 48 (S.D.N.Y. 1973).

### B. *Materiality*

The single allegation against the Exchange of direct involvement in the fraud centers on the January, 1968 extension of the loan agreements. The lenders charge that it was Robert M. Bishop, Vice President of the Exchange and Director of its Department of Member Firms, who personally urged them to renew their loans. As fleshed out by the affidavit of their attorney, who represented them in their negotiations with Pickard, the lenders claim that Bishop expressed the desire of the Exchange that they extend their loans, because without them Pickard would be forced into liquidation. Although the lenders admit that Bishop did advise them of the

disarray of Pickard's books and of the existence of a net capital violation, they intimate that he led them to believe that the firm was not insolvent, and they charge him with omitting to state the facts of Pickard's history of violations and disciplinary actions. (Burns Affidavit, September 16, 1975, ¶ 7)

The Exchange does not deny that Bishop spoke to the lenders, but it asserts that the alleged omissions could not have been material to the lenders' decision to extend the agreements at that time, pointing out that the most recent disciplinary action against Pickard was then already one year in the past. Further, Bishop maintains that he reported Pickard's poor condition as well as an apparent capital violation of approximately $900,000. to the lenders. (Bishop Affidavit, June 25, 1975, ¶ 11)

On the face of things, there is a serious question of the materiality of the alleged omission in January, 1968, particularly since Bishop informed the lenders of the suspected enormity of the capital violation at that time, a fact which the lenders do not deny. Damaging information, plainly material in ordinary circumstances, may well become immaterial if the person alleging fraud subsequently becomes aware of even more negative facts and yet goes ahead with the transaction. If proven, such a course of action would seem affirmatively to rebut the inference of reliance normally derived from the withholding of material information. See *Affiliated Ute Citizens*

**9.** *Independent Investors Protection League v. New York Stock Exchange,* 367 F.Supp. 1376 (S.D.N.Y.1973) is not to the contrary. That case held only that an investors protection group had no right under the Freedom of Information Act to obtain information from the Exchange about the financial difficulties of its members, and that, absent the elements of a securities law claim, the court could not rule in the abstract on the Exchange's policy of nondisclosure. 367 F.Supp. at 1377.

**10.** The Exchange is understandably concerned at the prospect of being liable for failure to make public information about members in difficulty while at the same time trying to take steps to see that the difficulty is eradicated. Its position is not unlike the recently publi-

cized dilemma of the Comptroller of the Currency accused of suppressing negative information about banks. See N.Y. Times, January 12, 1976 at 1, col. 1.

The issue here, however, is not one of general public disclosure, but of disclosure to investors in member firms. It is not unreasonable to question whether a private investor who considers placing his assets at the risk of the management of an Exchange member may not, at least under some circumstances, be entitled to the benefit of the Exchange's knowledge bearing on the severity of that risk. The statute on which this action is based, after all, favors the widest possible disclosure in securities transactions.

*v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

■ Two considerations, however, prevent us from granting summary judgment to the Exchange on this issue. The axiom that such relief is inappropriate where factual issues exist is a proposition which is applied with vigor in this Circuit. See, e. g., *Heyman v. Commerce and Industry Insurance Co.,* 2 Cir., 524 F.2d 1317 (1975). Moreover, materiality, being often a function of the totality of the surrounding circumstances, see, e. g., *Titan Group v. Faggen,* 513 F.2d 234, 239 (2d Cir. 1975), is a concept which is intimately related to the facts of each particular transaction. As such, it is an issue generally ill-suited to summary judgment. *Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir. 1970). For these reasons, this is a situation like that in *Schoenbaum v. Firstbrook,* 405 F.2d 215, 218 (2d Cir. 1968), in which it is simply not appropriate to grant summary relief before the plaintiffs have had a fuller opportunity to discover and develop the facts. We cannot declare that under no circumstances would a reasonable investor who decided to proceed with his investment despite the information disclosed by Bishop, have gone ahead with his decision if Bishop had further disclosed the facts of Pickard's long history of financial ills and trading restrictions. The full facts of that history are as yet unknown.

C. *The "In Connection With" Requirement*

According to the complaint, each of the four plaintiffs initially purchased his non-voting stock and entered the subordination agreement in 1966.[11] These first agreements were to be in effect for a period of months, and subsequently, each of the plaintiffs executed two or three extension agreements, the latest in February, 1968, just prior to Pickard's collapse. (Complaint ¶¶ 6–16) The Exchange, noting that many of the facts which were not disclosed relate to violations and disciplinary actions subsequent to the initial transactions but prior to at least some of the extension agreements, moves to strike those allegations in the complaint which refer to the later events and the renewals. It contends that after their initial investments, the lenders were simply holders of securities, and that in view of the principle that "mere retention" of securities during a period of an alleged violation does not satisfy the requirement that the violation be in connection with the purchase or sale of a security, *Pollak v. Eastman Dillon,* CCH Fed.Sec.L.Rep. ¶ 94,987, at 97,412 (S.D.N.Y.1975); *In re Hoe & Co., Inc.,* CCH Fed.Sec.L.Rep. ¶ 94,553, at 95,923 (S.D.N.Y.1974), these portions of the complaint must fail.

■ However, the argument rests on the mistaken assumption that the series of extensions of the subordinated loan agreements did not constitute separate purchases for purposes of the requirements of Rule 10b–5. The initial loan agreements and non-voting stock purchases were in force for a limited term only. Upon the termination date, Pickard would have been obliged to repay the loans. Each agreement to extend the arrangement therefore represented a new decision by the lenders to invest in Pickard and for purposes of Rule 10b–5, each extension agreement is entitled to be treated as a sale and purchase of a security. This court long ago observed that extension agreements are separate transactions under the securities laws. In making them,

> "[t]he purpose and aim of the [company] is to secure the retention and use of the [securities] holders' money for a further period after the . . . due date. Whether that day the holder takes $80 from his pocket and pays it over to the [c]ompany or whether he allows the [c]ompany to retain the $80 it has of his money cannot alter the case." *Securities Exchange Commis-*

---

11. Mrs. and Mr. Ours first invested in Pickard in January, 1966; Mrs. and Mr. Fischer did so in February and July of 1966, respectively.

*sion v. Associated Gas & Electric Co.,* 24 F.Supp. 899, 903 (S.D.N.Y.), *aff'd,* 99 F.2d 795 (2d Cir. 1938).

The Exchange also suggests that the "in connection with" requirement is not met because it was not a party to the lenders' dealings with Pickard. (Brief in Support of Motion at 27) This, however, begs the vital question, dealt with above, whether it nonetheless owed a duty of disclosure to these plaintiffs in connection with their securities transactions with its member firm. It also overlooks the allegation that it was a party to the January, 1968 extension.

### D. *Rule 9(b)*

■ The Exchange claims that the complaint fails to comply with the particularity requirement of Rule 9(b), Fed. R.Civ.P. In large part, however, its objections amount only to a restatement of the contention that it owed no duty of disclosure. To this extent the question is not the degree of specificity of the allegations but the existence of a claim for relief, and that matter has been treated above. Insofar as the Exchange does challenge the particularity of the averments, its position is without merit. The only arguable deficiency is that certain factual allegations (¶ 18–24; 29, 35) are made on information and belief without setting forth the factual basis for the belief. See *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir. 1974). This, however, is fully remedied by the affidavits and exhibits filed in connection with this motion, and no benefit can be had by requiring the lenders to replead their allegations to make clear in the amended complaint what is already perfectly clear from the totality of their submissions to date.

### E. *Punitive Damages*

The Exchange also moves to strike the prayer for punitive damages on the ground that they are not recoverable for violations of the securities laws. *Green v. Wolf Corp.,* 406 F.2d 291, 303 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). The lenders answer that in addition to securities violations, the complaint makes out a claim against the Exchange for common law fraud for which such damages may be appropriate.

■ We disagree, in the first place, with the lenders' contention that their allegations against the Exchange contain all the elements of common law fraud. With the exception of the January, 1968 incident, see B., *supra,* liability of the Exchange is asserted solely as a nonparticipant in the transaction. Common law fraud does not exist without a positive representation, see *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958), not alleged—or presumably allegeable—here. The Exchange correctly points out that even in the New York cases which predicate a finding of fraudulent representation on silence or partial disclosure, the defendant made some statement to the plaintiff. See, e. g., *Donovan v. Aeolian Co.,* 270 N.Y. 267, 200 N.E. 815 (1936) and *Noved Realty Corp. v. A. A. P. Co., Inc.,* 250 App.Div. 1, 293 N.Y.S.2d 336 (1st Dept. 1937). The direct dealing which occurred in those cases between plaintiff and defendant is simply not present here.

■ It is true that direct participation by the Exchange is alleged with regard to the January, 1968 renewal. Here, however, even assuming all the elements of deceit to be present, the prayer for punitive damages runs into another barrier. As the lenders themselves point out, their right to claim punitive damages depends on the availability of such relief under the law of New York. The New York Court of Appeals has made clear that such extraordinary relief will only be allowed "where the fraud, aimed at the public generally, is gross and involves high moral culpability." *Walker v. Sheldon,* 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497, 499 (1961). The allegations of wrongdoing in January, 1968, are not within that category. The fraud is neither aimed at the general public nor is it a continuing

course of wilful conduct. See *Walker v. Sheldon, supra,* 10 N.Y.2d at 406, 223 N.Y.S.2d at 492, 179 N.E.2d at 498.

Accordingly, the prayer for punitive damages is stricken.

### F. *The Statute of Limitations*

■ The third count against the Exchange alleges, in essence, a violation of § 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f (1971). In addition to challenging the sufficiency of the pleadings, the Exchange asserts that the claim is barred by the statute of limitations. We agree. The applicable limitations period is six years as provided in NYCPLR § 213(2). *Weinberger v. New York Stock Exchange,* 335 F.Supp. 139 (S.D.N.Y.1971). The complaint in this action was not filed until seven years after the last act complained of, which took place in early 1968.

We disagree with the *dicta* in *Hochfelder v. Midwest Stock Exchange, supra,* 503 F.2d at 375–76, which would permit a § 6 claim asserted in the posture of this case to be governed by the same equitable tolling doctrine as applies to allegations of fraud. As the court in *Hochfelder* recognized, actions based on § 6 are in the nature of negligence, not fraud. See *Rich v. New York Stock Exchange,* 522 F.2d 153, 155 n. 4 (2d Cir. 1975). To say that where a negligent act facilitates the fraud of another who then successfully conceals his fraud beyond the ordinary limitations period, the negligent wrongdoer should be subject to the same extended period of vulnerability to suit as the principal, overlooks the recognized distinction between the degree of culpability for negligence on the one hand and fraud on the other.[12]

### IV.

One further matter remains. The lenders have entirely failed to allege the requisite connection between the unlawful activity and means or instrumentality of interstate commerce which is a basic jurisdictional ingredient of all federal securities claims. In view of the exceedingly broad interpretation of this requirement, see *Heyman v. Heyman,* 356 F.Supp. 958, 969 (S.D.N.Y.1973), it is highly unlikely that such connection is actually lacking in this case, and we have, of course, proceeded on the assumption that the defect can be cured. Nevertheless, neither speculation by the court nor casual references by the lenders to the affidavits and exhibits on this motion (see Brief in Opposition at 14) can substitute for a vital jurisdictional allegation which is missing from the pleadings. Accordingly, if the lenders fail to file an amended complaint which remedies this deficiency within twenty days of the entry of this order, the complaint will be dismissed.[13]

The motion for a stay of arbitration is granted. The § 6 claim is dismissed and the prayer for punitive damages against the Exchange is stricken. In all other respects the motion is denied, subject to the filing of an amended complaint which properly alleges jurisdiction within twenty days.

Submit order on notice.

---

12. Though the lenders are precluded from maintaining their § 6 claim, proof of a failure by the Exchange to fulfill its § 6 responsibilities of oversight with regard to Pickard might have a bearing on whether it breached a duty of inquiry, if it is shown that the Exchange was unaware of Pickard's fraud. See *Hochfelder v. Midwest Stock Exchange, supra,* 503 F.2d at 374. In this Circuit, of course, for liability sounding in fraud to attach, the breach of duty would have to be more than mere negligence. *Republic Technology Fund, Inc. v. Lionel Corp.,* 483 F.2d 540, 551 (2d Cir. 1973); *Lanza v. Drexel & Co., supra.*

13. It will be sufficient at this stage of the litigation to allege the connection and set forth whatever factual basis for the claim the lenders currently possess, even if that basis falls short of the specificity which would ultimately be required to defeat a motion for summary judgment after there has been an opportunity for discovery. See *Heyman v. Heyman, supra,* 356 F.Supp. at 969; *Filmways, Inc. v. Artistic Liquidating Corp.,* CCH Fed.Sec.L.Rep. ¶ 92,-332 (S.D.N.Y.1969). See generally, 3 A. Bromberg, Securities Law: Fraud, § 11.2 (590) (1974).