R. Stockton RUSH III, Plaintiff,

v.

OPPENHEIMER & CO., INC. and Scott Seskis, Defendants.

No. 84 Civ. 3219 (RWS).

United States District Court,
S.D. New York.

Aug. 23, 1984.

Opinion on reargument, D.C., 596 F.Supp. 1529.

Lovell & Stewart, New York City, for plaintiff.

Joan Caridi, New York City, for defendants.

## OPINION

SWEET, District Judge.

R. Stockton Rush III ("Rush") commenced this action against Oppenheimer and Co. and Scott Seskis ("defendants") in order to seek the recovery of damages for alleged violations of the federal securities laws (Count One), violations of common law principles of fraud and fiduciary duty (Count Two), and the Federal Organized Crime Control Act of 1970 (Count Three). Defendants moved for an order dismissing the complaint pursuant to (1) Rule 9(b), Fed.R.Civ.P., for failure to allege fraud with the requisite particularity, and (2) Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted. Rush has consented to file an amended complaint that will satisfy the pleading requirements of Fed.R.Civ.P. 9(b). Defendants' remaining 12(b)(6) motion is denied with respect to Count One, granted with respect to Count Two to the extent of dismissing Rush's request for punitive damages, and granted with respect to Count Three.

### Background

Rush filed this action on May 8, 1984, alleging three causes of action against defendants. The first count alleges that defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (1983). Rush alleges 10b–5 violations by defendants including excessive trading ("churning") and unsuitable recommendations as to purchases of stocks.

The second count asserts in a pendent state claim that defendants violated a fiduciary duty to Rush arising under the laws of New York. The final count alleges that defendants' actions constitute on-going "racketeering activity" within the meaning of section 901(g) of the Organized Crime Control Act of 1970, 18 U.S.C. Section 1961(1)(D).

Rush alleges that from November, 1981 until December, 1983 defendant Scott Seskis ("Seskis") worked as a registered representative and an account executive of, and under the control and supervision of, defendant Oppenheimer and Co. ("Oppenheimer"), a Delaware corporation engaged in the business of securities brokerage. Rush claims to have been, at the inception of his dealings with defendants, a financially inexperienced and unsophisticated eighteen-year old with no prior contacts with investment houses or the "devices of Wall

Street." Rush asserts that beginning in November, 1981, Seskis persistently solicited Rush's business and in December, 1981, Rush opened an investment account with Oppenheimer, with Seskis acting as Rush's "customer man." Rush alleges that from the earliest moments of his relationship with Seskis he made it clear that he was a novice at investing, that his principal concern was an inheritance of 20,000 fully-paid shares of Natomas Company common stock held in trust for him, and that for tax reasons he could not sell his Natomas stock. Rush contends that despite Seskis' persistent efforts in November and December of 1981 to convince him to transfer his Natomas shares from his trust account into his Oppenheimer account, where they could be used as collateral for margin purchases, Rush refused to consent to a transfer. Rather, Rush alleges that he clearly conveyed to Seskis his unwillingness to make investments on margin, a process which he did not understand and which he considered "dangerous."

Rush asserts that from January until March 1982 defendants made numerous untrue statements in an effort to convince him to abandon his conservative investment strategy. Such alleged assertions included:

(a) that defendants were among the few brokers in the country who had the skill to invest in and "write" call options on equity securities in a conservative, risk-free system;

(b) that defendant Seskis had developed and refined a system of writing call options which was guaranteed to produce income as regularly as "dividends on blue chip stock";

(c) that defendant Seskis had numerous large accounts trusting him to invest for them in securities and, particularly, options thereon pursuant to his system;

(d) that defendant Seskis was financially well-off, recommended profitable options and other investments on a consistent basis, and that "see, every day that goes by that you don't get your Natomas stock in here, you lose money we would have made for you writing options on it";

(e) that defendants had "excellent" skill, operations and integrity on which plaintiff could rely and in which he could place his trust and confidence, for investment advice in the nature of a fiduciary relationship as existed over his trust account; and

(f) that defendants intended to avoid the "margin" investments which plaintiff had stated he wanted to avoid, and intended to undertake a prudent Natomas options writing program against his Natomas stock, and that he should, therefore, transfer the Natomas shares out of his trust account where he would make more money.

Rush alleges that in reliance on these assertions by defendants, on or about March 31, 1982, he entrusted his Natomas shares with defendants and authorized defendants to undertake a strictly limited program of writing Natomas options against such stock. Rush asserts that in the 18 months following the transfer of control over the Natomas shares to defendants, the defendants purchased unauthorized, unsuitable securities for Rush's account; charged Rush $92,000 in brokerage commissions and $47,000 in margin interest on an average equity balance of $275,000; caused him in excess of $300,000 in "investment" losses; made 325 separate transactions in his account; transformed such account into defendant Seskis' largest single and principal source of income; and "turned over" such $275,000 average account balance in excess of ten times. Throughout this period, and without Rush's permission, defendants allegedly traded in unauthorized stocks and financed these purchases with "margin" loans on Rush's account secured by Rush's Natomas stock. Rush alleges that defendants would only obtain his consent to these transactions subsequent to the transaction itself, and that such consent was obtained obliquely at best and by further untruthful assertions regarding the nature of the stocks purchased and the justification for such purchases.

Rush further alleges that in June, 1982, he informed defendants that he would be out of touch for the summer. He alleges that he expressly prohibited them from partaking in any transactions other than liquidating existing non-Natomas positions or writing options against his Natomas stock and that he received assurances of such limitations. Nonetheless, Rush claims that in the period between June 14 and August 11 defendants' escalated the prohibited activities, initiating numerous purchases and sales of securities financed by margin loans on Rush's account.

Upon his return in August, Rush alleges to have discovered and protested vigorously these continued violations of his understanding with Seskis. Rush claims that defendants', in order to maintain Rush's acquiescence in transactions violative of the pre-summer agreement and in order to maintain Rush as a client, then began to deceive Rush about both the nature of the securities defendants were purchasing and the underlying profitability of Rush's account, knowingly transforming large losses into apparent profits. Relying upon these false reports, Rush claims to have acquiesced to defendants' continued control over his account from August 1982 until September 1983, during which time defendants continued to purchase unauthorized stocks and highly risky options through margin financing. Simultaneously, defendants continued throughout this period to assert that Rush's accounts were profitable.

Finally, in September 1983, upon being informed of the nature of the defendants' transactions over the prior period, Rush allegedly demanded a written profit and loss accounting. Rush maintains that defendants refused to produce such a document, falsely claiming several times to have sent such an accounting to Rush.

Finally, Rush alleges that defendants, in September 1983, convinced him to purchase 11,000 shares of "Computer Devices" by falsely and knowingly asserting that a French financing would bolster that company's prospects. On or about October 31, 1983, Computer Devices filed for protection under Chapter 11 of the Bankruptcy Code, and Rush alleges that the financing of which defendants informed Rush was never a reality.

Soon after October 31, 1983 Rush claims to have ordered the liquidation of all his securities at Oppenheimer.

**Count One—The § 10b–5 Claim**

For Count One to survive defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., it must assert that (1) defendants misrepresented or omitted to state material facts in connection with the purchase or sale of a security, (2) Rush relied to his detriment upon defendants' misrepresentations or omissions; and (3) defendants made their misrepresentations or omissions with "scienter," that is, an intent to deceive, manipulate, or defraud Rush. *See Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1231 (S.D.N.Y.1981); *Lloyd v. Industrial Bio-Test Laboratories, Inc.,* 454 F.Supp. 807, 810 (S.D.N.Y.1978).

Numerous misrepresentations are alleged by Rush, including (1) the misrepresentation of defendants' intent to manage the account for the best interest of Rush and within the strict investing guidelines defined by Rush; (2) the misrepresentation of defendant Seskis' individual experience and skill with respect to various investment devices; (3) the misrepresentations with respect to the profitability of Rush's account; (4) the misrepresentation with respect to defendants' willingness to abide by restrictions on their investment decisions during the periods when Rush was unavailable for consultation, and (5) the misrepresentation with respect to the finances of Computer Devices.

These misrepresentations are "in connection" with the purchase or sale of securities, as required by Rule 10b–5. A purchase can occur whenever an investor takes action that "represent[s] a new decision by [him] to invest." *Fischer v. New York Stock Exchange,* 408 F.Supp. 745, 755 (S.D.N.Y.1976); *Troyer v. Karcagi,* 476 F.Supp. 1142, 1148 (S.D.N.Y.1979). The "in

connection" requirement is therefore satisfied not only by initial misrepresentations that induced Rush's entrusting his stock to defendants, but by later alleged misrepresentations which amounted to a "new decision" by Rush to invest. While misrepresentations inducing "mere retention" of funds already in a discretionary fund cannot be the basis of a 10b–5 action, *see Troyer, supra,* at 1148, misrepresentations occurring prior to a plaintiff's acquiescence to purchases through an essentially non-discretionary account can give rise to a 10b–5 action. Such "reinvestment" decisions and specific instances of approval following misrepresentations are alleged by Rush. Rush also claims the requisite elements of reliance and scienter.

■ Rush also alleges a "churning" claim under 10b–5. "Churning occurs when a securities dealer abuses his customer's confidence for personal gain (e.g. to create commissions) by inducing transactions in the customer's account which are disproportionate to the size and character of the account. Churning has been held to be a deceptive device within § 10b ... for which a private cause of action for damages will lie." *Newburger, Loeb & Co., Inc. v. Gross,* 563 F.2d 1057, 1069 (2d Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Armstrong v. McAlpin,* 699 F.2d 79, 90 (2d Cir.1983). To establish churning a plaintiff must show (1) that the trading in the account was excessive in light of his investment objectives, (2) that the broker exercised control over the account, and (3) that the broker acted with intent to defraud or with willful and reckless disregard for the interests of his client. *See Mihara v. Dean Witter & Co., Inc.,* 619 F.2d 814, 821 (9th Cir.1980); *Faturik v. Woodmere Securities, Inc.,* 442 F.Supp. 943 (S.D.N.Y.1977); *Rolf v. Blyth Eastman Dillon & Co., Inc.,* 424 F.Supp. 1021 (S.D.N.Y.1977), *aff'd,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Although there is no clear demarcation between excessive and non-excessive trading, it is thought by courts and commentators that an annual turnover rate in excess of six reflects excessive trading. *See Mihara, supra,* at 821; *Rolf, supra,* at 1039. Rush here alleges that over an eighteen month period his portfolio was turned over 10 times. Especially when Rush maintains that he had advised defendants that he wanted to pursue a conservative investment policy, this turnover rate satisfies the threshold pleading requirement for churning.

■ Rush also pleads the second and third elements of churning by asserting that defendants, even if supposedly constrained by an agreement limiting the range of permissible investments for the account, disregarded those constraints and effectively exercised control over the account. *See Zaretsky v. E.F. Hutton & Co., Inc.,* 509 F.Supp. 68 (S.D.N.Y.1981). Rush also alleges that defendants possessed the scienter necessary to establish churning.

■ Rush also maintains a 10b–5 claim founded upon defendants' continued recommendation of unsuitable investments. An assertion that a broker knew or reasonably believed that investments were unsuitable but that he recommended them to plaintiff nonetheless states a violation under 10b–5. *See Clark v. John Lamula Inv., Inc.,* 583 F.2d 594, 600 (2d Cir.1978); *Mauriber v. Shearson/American Exp., Inc.,* 567 F.Supp. 1231, 1237 (S.D.N.Y.1983); *Savino, supra,* at 1241. Rush satisfies this burden: the complaint asserts that the plaintiff had restricted the nature of stocks to be purchased to prudent, non-risky investments. Nonetheless, Rush alleges that defendants deliberately misrepresented the risk of multiple investments and undertook highly risky investment stratagems.

Count One of Rush's complaint survives defendants' 12(b)(6) attack.

## Count 2: Common Law Fraud

■ Recovery for common law fraud can be based upon a material misrepresentation made with scienter which induces reliance to the detriment of the party to whom the misrepresentation was made. *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 545 F.Supp. 1314, 1359 (S.D.N.Y.

1982). Non-disclosure of material information or failure to disclose information which is necessary to make other representations not misleading are also actionable provided there was a fiduciary relationship between the parties or a duty of disclosure arising from a relationship of trust and confidence between the parties. *Fund of Funds, Ltd. v. Arthur Andersen & Co., supra,* at 1359.

█ The same allegations of fact that support the necessary elements of Rush's 10b–5 claim—material misrepresentation, scienter, and reliance—provide a foundation for this common law fraud claim.

█ However, Rush does not allege facts that provide a basis for punitive damages, and his claim for punitive damages is consequently dismissed. As this court recently decided: "In New York, punitive damages may be awarded in actions for fraud only where the fraud is 'aimed at the public generally,' evincing a 'high degree of moral turpitude,' and demonstrating 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *Kaufman v. Chase Manhattan Bank, N.A.,* 581 F.Supp. 350, CCH Fed.Sec.L.Rep. ¶ 99,678 at p. 97,725, 97,729 (S.D.N.Y.1984). *See Durham Industries, Inc. v. North River Insurance Co.,* 673 F.2d 37, 41 (2d Cir.), *cert. denied,* 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982); *Zaretsky v. E.F. Hutton & Co., Inc.,* 509 F.Supp. 68, 77 (S.D.N.Y. 1981) (mere allegations of fraud do not give rise to a cause of action for punitive damages).

The facts pleaded by Rush do not establish either that the fraud was aimed at the public generally or that the defendants possessed such a high degree of moral turpitude that their acts displayed wanton dishonesty. Rush's pleading for punitive damages is therefore dismissed.

### Count Three—Civil RICO

█ Rush fails to allege the necessary requisites of a civil RICO case as recently redefined by this Circuit in *Sedima, S.P. R.L. v. Imrex Co., Inc.,* 741 F.2d 482 (2d Cir.1984). The prior criminal convictions of defendant that must be alleged as the pred-

icate offenses are clearly not set forth. Nor is the special "racketeering injury," as defined in *Sedima, supra,* at 496, alleged by Rush. Count three is consequently dismissed.

### Conclusion

Count One, alleging 10b–5 violations, survives the 12(b)(6) motion. Count Two, alleging common law fraud, is dismissed to the extent that Rush will not be allowed to seek punitive damages. Count Three is dismissed.

**IT IS SO ORDERED.**