**Roger P. GAUDETTE and Jeannine R. Gaudette, Plaintiffs,**

v.

**Peter PANOS and E.F. Hutton & Company, Inc., Defendants.**

Civ. A. No. 86–0393–C.

United States District Court, D. Massachusetts.

Sept. 24, 1986.

Robert C. Barber, Bradley W. Snyder, Looney & Grossman, Boston, Mass., for plaintiff.

Gerald F. Rath, Bingham, Dana & Gould, John R. Snyder, Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil action brought by Roger P. Gaudette and Jeannine R. Gaudette against Peter Panos and E.F. Hutton & Company, Inc. ("Hutton"). The defendant Peter Panos was a broker and an employee at Hutton's Salem, Massachusetts office during the time period relevant to this action. The plaintiffs seek to recover monetary damages caused by the alleged fraudulent and negligent administration of various investment accounts by Panos and Hutton. Count I of the second amended complaint[1] alleges a violation of Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10–b–5, 17 C.F.R. 240, 10b–5. Count VI alleges a violation of Section 4o of the Commodity Exchange Act. 7 U.S.C. § 6o. Counts VII and VIII were brought pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1964(c), alleging violations of 18 U.S.C. § 1962(c) and (d). Finally, invoking the doctrine of pendent jurisdiction, the plaintiffs request this Court to exercise jurisdiction over their state law claims in Counts II, III, IV, V, IX, and X.[2]

---

1. The Court twice allowed the plaintiffs to amend their complaint.

2. Count II alleges a violation of Massachusetts Blue Sky Law, Mass.Gen.Laws Ann. ch. 110A, §§ 101 and 102, Count III alleges breach of fiduciary duty, Count IV alleges common law fraud and deceit, Count V alleges common law negligence, Count IX alleges common law negligent misrepresentation, and Count X alleges breach of contract.

The matter is now before the Court on the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), 9(b), and 12(b)(1). In their motion and supporting memoranda, the defendants maintain that Count I, the Section 10(b) and Rule 10b–5 claim, Count VI, the Commodity Exchange Act claim, and Counts VII and VIII, the RICO claims, fail to state a claim upon which relief can be granted and fail to allege the circumstances of the purported fraud with the particularity required by Fed.R.Civ.P. 9(b). The defendants further maintain that if Counts I, VI, VII, and VIII are not barred on those grounds, those parts of Counts I, VI, VII, and VIII pertaining to pre-February 4, 1984 transactions are time-barred. The remaining counts, Counts II, III, IV, V, IX, and X also should be dismissed, the defendants argue, because the plaintiffs have filed a state court suit against the defendants in which they have made identical claims raising the same issues as are present here.

This case raises important and complex questions concerning three major pieces of federal legislation. After careful consideration of the arguments presented on behalf of both parties, I rule that plaintiffs' claims under the Securities Exchange Act, plaintiffs' claims under the Commodity Exchange Act, and plaintiffs claims under the so-called RICO statute against defendant Panos should not be dismissed. Review of the language and intent of RICO, as well as of recent decisions in this and other circuits, however, leads me to conclude that plaintiffs' RICO claims against defendant Hutton should be dismissed for failure to allege an enterprise separate and distinct from the person alleged to conduct the enterprise's affairs. Finally, the Court declines to exercise its discretionary pendent jurisdiction over plaintiffs' state law claims having in mind that plaintiffs are parties to a suit in state court which makes the same claims.

The second amended complaint alleges a pattern of fraudulent activity by the defendant Panos from approximately April of 1983 when the plaintiffs entrusted the management of their investment accounts to Panos through approximately November of 1984 when the plaintiffs began transferring their accounts out of Hutton. The second amended complaint alleges that as of April, 1983 the plaintiffs owned a portfolio of securities with a net value of approximately $507,322. The portfolio consisted primarily of stock in Computervision, Inc. acquired by the plaintiffs over a number of years through employee stock options and employee bonuses. The plaintiffs' primary investment objective prior to and through April, 1983, the second amended complaint alleges, was the maintenance of a growing, income producing portfolio invested in conservative and well managed growth companies.

In April of 1983 the plaintiffs, who already used one broker at Hutton, sought another broker who could also serve as a financial advisor to guide the growth and preservation of their portfolio. With this objective, the plaintiffs met with the defendant Panos and allegedly informed him of their investment objectives of growth and income, their desire to retain securities already in their portfolio, particularly the Computervision stock, their reluctance to trade on margin due to the risks involved, their desire to liquidate promptly any investment as soon as its upward trend appeared to be peaking, and their need for someone to monitor their account daily. At this April meeting, Panos allegedly represented to the plaintiffs that he was a qualified financial advisor with many years of education, experience, knowledge, and with the skill and tools to monitor accounts effectively and to enable him to make responsible decision in the best interest of his clients. According to the second amended complaint, Panos also represented to the plaintiffs that it was his practice to monitor personally his clients' accounts on a daily basis and that he and Hutton would monitor the plaintiffs' account on a daily basis if the plaintiffs decided to engage them. When the plaintiffs expressed concern about trading on margin, Panos allegedly represented that the plaintiffs' margin account balance would not exceed the 50%

limitation set by the Federal Reserve Bank and that the interest charges on the plaintiffs' account for any one year would not exceed $10,000, the interest deduction limit under the federal tax laws. Finally, at the April meeting Panos allegedly represented to the plaintiffs that he and Hutton would closely monitor the plaintiffs' IRA accounts on a daily basis and would minimize losses to those accounts in a declining market by transferring funds from the growth IRA into Hutton's more stable investment IRA.

According to the second amended complaint, Panos intended all of the above representations to induce the plaintiffs to turn over their account to him and to transfer their other stock holdings to Hutton. On May 3, 1983 the plaintiffs allegedly arranged for the delivery to Hutton of 6,346 shares of Computervision stock. From May 2, 1983 through May 16, 1983 Panos allegedly spent $200,000 purchasing stocks and calls. Although Mr. Gaudette asked Panos on or about May 16, 1983 what funds were used to purchase these securities, Panos did not inform him that he had drawn heavily on the plaintiffs' margin account to purchase these securities.

At a meeting on or about May 24, 1983, Panos allegedly urged the plaintiffs to enter the futures market. Panos allegedly promised the plaintiffs that he would not allow them to lose more than one-half of whatever they committed to futures, that he would monitor the market's trends on a daily, or even hourly, basis, that upon the slightest reverse in the market he and Hutton would "bail out" and thereby minimize any losses. According to the second amended complaint, Panos allegedly failed to fully explain the risks of investing in the commodities market, which the plaintiffs allege would have enabled them to understand Panos's trading in futures and to appreciate that his trading was unsuitable in light of the plaintiffs' investment objectives. Allegedly as a result of these representations by Panos, the plaintiffs committed $25,000 from their margin account to a commodity account and gave Panos and Hutton full discretion in handling the account. Panos allegedly represented at that time that he would soon return this $25,000 to the margin account to minimize the accumulation of interest on the margin account. This promise notwithstanding, Panos allegedly never returned these funds; instead, he allegedly started on a course that resulted in the accumulation of excessive interest and, ultimately, in calls on the plaintiffs' margin account. On June 28, 1983, allegedly upon the recommendation of Panos, Mr. Gaudette drew $17,000 from the margin account to pay off a debt in that amount, thereby generating additional interest charges to that account. Shortly thereafter, Mr. Gaudette told Panos that he was concerned about the amount of interest being charged to his margin account. In response, Panos allegedly again represented that he would not allow the interest charged to the plaintiffs' margin account to exceed $10,000.

Prior to engaging the services of Mr. Panos, the plaintiffs owned shares of MCI stock with a market value of approximately $96,000. At the meeting between Panos and the plaintiffs in April of 1983, Panos allegedly represented that the MCI stock had peaked and should be sold as soon as sufficient time passed for long-term capital gains recognition. The plaintiffs later informed Panos that the one year holding period for capital gains recognition would be met as of July 8, 1983. The second amended complaint alleges that Panos failed to sell the MCI stock after July 8, 1983. When Mr. Gaudette received his August, 1983 statement, he saw that Panos had not sold the stock, which by that time had declined in value to under $60,000. Instead of selling the MCI stock at that time, Panos allegedly reassured Mr. Gaudette that the MCI stock would recoup some of its losses even though he allegedly had an insufficient basis for that belief. The MCI stock continued to decline in value, however, and was ultimately sold by Panos in 1984 for $40,272. According to the second amended complaint, during the first six month period of the margin account, Panos allowed $31,500 of interest charges which, of course, meant a profit

for Hutton to build up on the account notwithstanding his representations that he would not allow more than $10,000 in charges to accrue.

The second amended complaint further alleges that Mr. Gaudette asked Panos to sell 11,300 shares of International Breeders, Inc. stock to finance 1500 shares of stock in New World Bank. The second amended complaint alleges that, in breach of his fiduciary duty, Panos failed to warn the plaintiffs that the sale of the International Thoroughbred Breeders, Inc. stock and the deposit of the proceeds in an account at Dean Witter would deplete their margin account to the extent that shortly thereafter there would be a margin call on the account. In February, 1984 Panos informed Mr. Gaudette that the plaintiffs would have to deposit more cash or stock in the margin account to bring it within an acceptable range. The margin call allegedly was a direct result of the defendants' failure to sell stocks that were declining in value and Panos's transferring of funds from the margin account to the commodity account without the plaintiffs' prior knowledge or authorization. The second amended complaint also alleges that during this time Panos, motivated by a desire to fraudulently generate commissions for himself and to benefit Hutton by the accumulation of interest charges rather than to benefit the plaintiffs, purchased calls with funds needed to cover the plaintiffs' position in their margin account.

In February of 1984 Panos allegedly began selling calls on the plaintiffs' Computervision stock to cover the margin deficiency on the plaintiffs' account without the plaintiffs' approval and notwithstanding Panos's representation to the plaintiffs in April of 1983 that he would not allow their margin account to reach a position where their ownership of the Computervision stock would be jeopardized. In February and March of 1984 Panos allegedly transferred $37,679.00 from the plaintiffs' margin account to cover shortages in the commodity account and failed to disclose these transfers to Mr. Gaudette, whom he spoke to daily during that period, even though they resulted in additional interest charges to the margin account. In May and June of 1984, Panos allegedly transferred a total of $24,000 from the margin account to the commodity account. Due to these transfers, the plaintiffs' margin account again became short and, as a result, Panos had to begin a program of selling short the stock in the account. For the period from May, 1983 through September, 1984, the plaintiffs' margin account allegedly bore interest charges of $58,004.23.

As to the commodity account, the second amended complaint alleges that despite the decline in the amount of cash in the commodity account from $25,000 to $19,500 by December 31, 1983, acting with reckless disregard for the plaintiffs' best interests, Panos induced the plaintiffs to remain in the futures market by making recklessly optimistic predictions. The second amended complaint alleges that, in telephone conversations between Panos and Mr. Gaudette during 1984, Panos was always optimistic with respect to the futures contracts that he had been purchasing and assured Mr. Gaudette that the contracts would be recouping their losses prior to expiration. Such assurances allegedly persuaded the plaintiffs to believe that their commodity account was being monitored according to their conservative investment objectives while Panos actually was trading erratically and without any comprehensible strategy. Panos allegedly knew or recklessly disregarded the fact that he lacked a sufficient basis for his optimistic predictions. When asked to explain his "apparent trading madness," Panos allegedly responded with unrealistic predictions which served to mask the financial deterioration of the account.

In November of 1984, because of Panos's and Hutton's alleged inadequate administration of the plaintiffs' accounts, Mr. Gaudette began transferring the accounts out of Hutton. As a result of the defendants acts, the plaintiffs allegedly suffered a decline in the value of their portfolio in the amount of $421,322 and also incurred $43,405.21 in interest charges above the $20,-

000 in charges that they were able to deduct on their tax returns. Finally, the second amended complaint alleges that all of the acts and omissions of the defendant Panos were undertaken with the actual or apparent authority of, and under the supervision of, the defendant Hutton and that such acts and omissions were undertaken in connection with the performance by Panos of his duties as a Hutton employee.

In evaluating the defendants' motion to dismiss, the Court must decide whether under any set of possible circumstances the plaintiffs have stated a claim. It would be improper to dismiss any one of the plaintiffs' claims "unless it appears beyond doubt that [the plaintiffs could] prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The Court, in ruling on the motion, must take all of the allegations of the complaint to be true and view them in the light most favorable to the plaintiffs. *O'Brien v. DiGrazia*, 544 F.2d 543, 545 (1st Cir.1976).

## I. *The Section 10(b) and Rule 10b–5 Claim*

Count I of the complaint alleges that the defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.-10b–5.[3] The defendants' first argument is that the second amended complaint fails to satisfy the requirement of § 10(b) and Rule 10b–5 that the alleged fraud be "in connection with the purchase or sale of any security." Relying primarily upon *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d

930, 942–943 (2d Cir.1984), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), the defendants maintain that in Count I the plaintiffs allege only that Panos mismanaged their account, not that Panos made misrepresentations or nondisclosures in connection with any particular security. For the reasons set forth below, I rule that the allegations in the complaint satisfy the "in connection with" requirement.

In *Chemical Bank*, banks that had made a loan to a borrower sued Arthur Andersen & Co. on the grounds that it had misrepresented the borrower's financial condition to the banks. As security for the loan, the borrower pledged 100% of its stock to the banks. There was no allegation that Andersen had made any representations with respect to the stock pledged by the borrower. In that situation, the Court of Appeals for the Second Circuit held that the misrepresentations did not form the basis of a violation of § 10(b) and Rule 10b–5. *Chemical Bank*, 726 F.2d at 943.

The allegations in the complaint in this case are quite different than those in *Chemical Bank* and are sufficient to state a claim under § 10(b) and Rule 10b–5. The complaint alleges that at the initial meetings between the parties in April and May, 1983 Panos misrepresented his intention to manage the plaintiffs' accounts in accordance with the plaintiffs' conservative investment objectives and in the plaintiffs' best interest, his level of skill and experience, and his intention to monitor the plaintiffs' accounts on a daily basis if they engaged his services. In *Rush v. Oppenheimer & Co., Inc.*, 592 F.Supp. 1108, 1111

---

**3.** Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j, provides in relevant part:

It shall be unlawful for any person ... (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5, provides in relevant part:

It shall be unlawful for any person ...

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

(S.D.N.Y.1984), the court held that such alleged misrepresentations alone were sufficient to satisfy the "in connection with" requirement. The Court in *Rush* went on to explain that a "purchase" within the meaning of Rule 10b–5 occurs whenever an investor takes action that "represent[s] a new decision by [him] to invest." *Id., quoting from Fischer v. New York Stock Exchange*, 408 F.Supp. 745, 755 (S.D.N.Y. 1976); *Troyer v. Karcagi*, 476 F.Supp. 1142, 1148 (S.D.N.Y.1979). In the instant case, Panos's alleged misrepresentations prior to the plaintiffs' decision to hire him and invest their money satisfy the "in connection with" requirement.

The second amended complaint contains allegations of misrepresentations and material omissions in addition to those discussed above. For example, on two occasions, at the initial meeting in April of 1983 and in July of 1983, Panos allegedly told the plaintiffs that he would not allow the interest charges on their margin account to exceed $10,000 for any one year. Notwithstanding this promise, the complaint alleges that Panos allowed charges to accrue greatly in excess of that amount. Panos also allegedly failed to disclose to the plaintiffs in February of 1984 that he had begun selling calls on their Computervision stock even though the plaintiffs had told Panos of their desire to retain their Computervision stock and Panos allegedly had told the plaintiffs that he would not allow their margin account to reach a position where their ownership of the Computervision stock would be jeopardized. Given these allegations, I decline to rule at this stage of the case that Count I does not satisfy the "in connection with" requirement of § 10(b) and Rule 10b–5. *Cf. In re Catanella and E.F. Hutton & Co.*, 583 F.Supp. 1388, 1410 (E.D.Pa.1984) (where failure to disclose the risks of margin trading caused plaintiffs to purchase more securities than they would have otherwise, thus satisfying the "in connection with" requirement).

The defendants next maintain that to the extent that the plaintiffs' claims in Count I concern trades in futures, those claims must be dismissed because futures and futures accounts are regulated by the Commodity Exchange Act, not the Securities Exchange Act of 1934. The Commodity Exchange Act provides that "[t]his chapter shall apply to ... transactions involving ... contracts of sale (or options on such contracts) for future delivery of a group or index of securities." 7 U.S.C. § 2a(ii). The Securities Exchange Act of 1934, as amended in 1982, provides that a "security" includes "any investment contract." 15 U.S.C. §§ 77b(1), 78c(a)(10). The plaintiffs do not dispute that the Commodity Exchange Act governs futures contracts; however they argue that "the fact of and events surrounding the period of the commodity account constitute an investment contract which falls within the definition of 'securities' as defined in the Exchange Act."

Discretionary accounts in commodities futures contracts have been held to be "investment contracts" within the meaning of the Securities Exchange Act. *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). A scheme is an investment contract only if it "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *S.E.C. v. Howey Co.*, 328 U.S. at 301, 66 S.Ct. at 1104. Nowhere in the second amended complaint do the plaintiffs allege that they were involved in a "common enterprise" with the defendants. Therefore, none of the futures contracts the defendants entered into on behalf of the plaintiffs was an "investment contract" within the meaning of the Securities Exchange Act of 1934 and, accordingly, to the extent that Count I arises out of transactions in futures, it should be dismissed.

The circuit courts of appeals have adopted different positions as to what types of arrangements constitute common enterprises. The narrowest view requires horizontal commonality, usually evidenced by a pooling of assets from two or more investors into a single investment fund. *E.g. Curran v. Merrill, Lynch, Pierce,*

*Fenner & Smith, Inc.*, 622 F.2d 216 (6th Cir.1980), *aff'd on other grounds*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). The position taken by the Fifth Circuit is that a common enterprise may be found where the arrangement is nothing more than a vertical arrangement between the investor and a broker. *Securities Exchange Commission v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974). The Ninth Circuit and the Southern District of New York have adopted an intermediate vertical position: not finding a common enterprise where the relationship is a simple commission agency but finding that a contract in which the broker's fortunes are tied directly to the investor's success satisfies the commonality requirement. *Mordaunt v. Incomco*, 686 F.2d 815 (9th Cir.1982), *cert. denied*, 469 U.S. 1115, 105 S.Ct. 801, 83 L.Ed.2d 793 (1985); *Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225 (S.D.N.Y.1981). Although the First Circuit has not addressed the issue, three judges in this district have endorsed this middle or narrow vertical commonality approach. *Schofield v. First Commodity Corp. of Boston*, 638 F.Supp. 4 (D.Mass. 1985), *aff'd on other grounds*, 793 F.2d 28 (1st Cir.1986); *Kaufman v. Magid*, 539 F.Supp. 1088, 1096–97 (D.Mass.1982) (Tauro, J.); *Holtzman v. Proctor, Cook & Co., Inc.*, 528 F.Supp. 9, 14–16 (D.Mass.1981) (McNaught, J.). I now adopt this position as well and rule that because there is no allegation in the complaint that Panos's or Hutton's fortunes were tied directly to the plaintiffs' success as investors in any futures contract, the common enterprise requirement of the *Howey* test is not satisfied.

The defendants also contend that the plaintiffs have failed in Count I to plead their § 10(b) and Rule 10b–5 claim with the particularity required by Fed.R.Civ.P. 9(b). More specifically, the defendants contend that the second amended complaint fails to specify any alleged misrepresentations or omissions by the defendants, does not inform the defendants which of Panos's alleged statements were false or how they were false, does not identify which of the plaintiffs' accounts or securities or specific investments were unsuitable or how or why they were unsuitable, and does not specify what recommendations and untrue statements of material fact or omissions to state material facts with respect to specific investments were made or by whom, to whom, when, how, and where they were made. The defendants also maintain that the second amended complaint fails to differentiate between the defendants and fails to specify the alleged fraudulent acts of each.

■ Fed.R.Civ.P. 9(b) provides in pertinent part that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) applies in all cases in which "fraud lies at the core of the action." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985). One of the main purposes behind the rule is to apprise the defendant of fraudulent claims and of the acts that form the basis of those claims. *Id.* at 443. The rule is also said to be designed to protect defendants whose reputation could be harmed by lightly made charges of wrongdoing involving moral turpitude, to minimize "strike suits," and to discourage the filing of suits in the hope of turning up relevant information during discovery. *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 229 (1st Cir.1980), *citing* 5 Wright & Miller, Federal Practice: Civil § 1296 (1969 ed.); *Temple v. Haft*, 73 F.R.D. 49, 52 (D.Del.1976). To satisfy the requirements of Rule 9(b), a complaint must give the time, place, and contents of the alleged misrepresentations or omissions, but not the circumstances from which fraudulent intent could be inferred. *Hayduk*, 775 F.2d at 444. Conclusory allegations of fraud are insufficient under the rule "no matter how frequently repeated." *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972). After carefully reviewing the language of Count I of the complaint, I rule that it satisfies the requirements of Rule 9(b).

The second amended complaint alleges with particularity that Panos both made untrue statements of material fact that were relied upon by the plaintiffs to their detriment and omitted to state material facts necessary to make those statements which were made not misleading in light of the circumstances under which they were made. For example, the second amended complaint alleges that the plaintiffs met with Panos in April of 1983 and at that meeting Panos represented to the plaintiffs that he was a duly qualified financial advisor with many years of education and experience, that he had the knowledge, skill, and tools to monitor accounts effectively, and that Panos represented to the plaintiffs that it was his practice personally to monitor his clients' accounts on a daily basis and that he and E.F. Hutton would do so for the plaintiffs if the plaintiffs decided to engage them. The plaintiffs allegedly engaged the defendants in reliance upon these representations. The second amended complaint goes on to allege repeatedly specifics as to how these representations were false and the manner in which the plaintiffs relied upon these misrepresentations. Another example of specifically pleaded representations is Panos's two representations, one in April of 1983 and another in July of 1983, that he would not allow more than $10,000 in interest charges to accrue to the plaintiffs' margin account per year. The second amended complaint specifically alleges that notwithstanding this representation Panos allowed $31,500 in interest charges to the account during the first six months and $58,004.23 in charges for the period of May of 1983 through September of 1984. In February of 1984 Panos allegedly sold calls on the plaintiffs' Computervision stock without informing them he was doing so although the plaintiffs allegedly told Panos in April of 1983 that they did not want to dispose of this stock. The second amended complaint contains many exact or approximate dates with respect to these and other representations or omissions by Panos, the manner in which the plaintiffs relied on these representations or omissions, and the extent to which they were damaged as a result.[4]

The defendants' argument that Count I should be dismissed on the grounds that the complaint fails to differentiate the defendants and specify the alleged fraudulent acts of each defendant is also without merit. The plaintiffs' position is not that Hutton engaged in fraudulent conduct independent of Panos; it is that Hutton is secondarily liable for each of the fraudulent acts of Panos because Panos was at all relevant times an employee of Hutton.[5]

4. One of the allegations in Count I is that the "underlying transactions" made by Panos during the relevant period were unsuitable in light of the plaintiffs' investment objectives. The defendants correctly argue that this is a bare allegation with no facts alleged to support it. Other courts have required the plaintiff at least to identify the transactions and give some reason why he considers the securities acquired to be unsuitable. *E.g. Vetter v. Shearson Hayden Stone, Inc.,* 481 F.Supp. 64, 66 (S.D.N.Y.1979); *Polera v. Altorfer, Podesta, Woolard and Co.,* 503 F.Supp. 116, 119 (N.D.Ill.1980). The plaintiffs maintain that the defendants contain in their records all the details concerning the identity of the securities traded, and the date, nature, and amount of each transaction. Given the specificity of the plaintiffs' other allegations in Count I and the Court's lack of knowledge of the availability of this information to the plaintiffs, I rule that the plaintiffs' claim of unsuitability should not be dismissed at this stage of the case for failure to satisfy rule 9(b).

5. In their memorandum in support of their motion to dismiss the original complaint, the defendants argued that the plaintiffs' allegations of scienter in the complaint were inadequate. Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Plaintiffs need not allege "circumstances or evidence from which fraudulent intent could be inferred." *Wayne Investment, Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 13 (1st Cir.1984), *quoting from McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980). In the second amended complaint, the plaintiffs allege that the defendants made representations "knowing or with reckless disregard of the fact, that those representations were untrue or were, in the light of the circumstances in which they were made, misleading" and that Panos administered the plaintiffs' margin account without disclosing to them that he "knew of the unsuitability of underlying transactions and the effect such transactions would have on the interest level of the [plaintiffs'] margin account." I rule that these allegations

The defendants maintain that the applicable limitations period for the plaintiffs' § 10(b) and Rule 10b–5 claim in Count I is the two year period provided in the Massachusetts Blue Sky Laws, Mass.Gen.Laws Ann. ch. 110A, § 410(e), that the original complaint was filed on February 4, 1986 and that, therefore, Count I is barred to the extent that it pertains to transactions prior to February 4, 1984. The plaintiffs, on the other hand, contend that the three year general tort statute of limitations in Mass. Gen.Laws Ann. ch. 260, § 2A is the applicable limitations period, but that even if the Court decides to apply the two year period argued for by the defendants, Count I, to the extent that it pertains to transactions prior to February 4, 1984, is not barred because those transactions were part of a "continuous wrong" which did not end until November, 1984, when the plaintiffs began transferring their accounts out of E.F. Hutton. In the alternative, the plaintiffs contend that the doctrine of equitable tolling applies and, for that reason, the pre-February 4, 1984 transactions are not time-barred.

■ Neither § 10(b) nor Rule 10b–5 contain a limitations period. To determine the appropriate period, therefore, the Court must "look to the limitations period applicable to the analagous cause of action under state law...." *Cook v. Avien, Inc.,* 573 F.2d 685, 694 (1st Cir.1978). The plaintiffs contend that under state law, common law fraud actions are the most analogous actions to § 10(b) and Rule 10b–5 actions. The defendants argue that Massachusetts' Blue Sky Law Mass.Gen.Laws Ann. ch. 110A, § 410(a)(2), provides the most analogous cause of action. The Court of Appeals for the First Circuit has held that the three year limitations period for personal tort suits provided by Mass.Gen.Laws Ann.

ch. 260, § 2A governs securities fraud actions. *Cook,* 573 F.2d at 694 n. 20; *Janigan v. Taylor,* 344 F.2d 781, 783 (1st Cir. 1965).[6] The defendants, however, correctly point out that the causes of action in both *Cook* and *Janigan* accrued prior to November 1, 1972, when § 410(a)(2) was enacted. The only court in the District of Massachusetts expressly to consider this issue held that the cause of action created in § 410(a)(2) is more like the § 10(b) and Rule 10b–5 cause of action than the common law fraud action and, therefore, the two year limitations period found in § 410(e), which applies to § 410(a)(2) actions, also applies to § 10(b) and Rule 10b–5 actions. *Abelson v. Strong,* 644 F.Supp. 524, 530–532 (D.Mass.1986) (Skinner, J.). For the following reasons, I now also rule that the two year period provided in § 410(e) is the applicable period.

Prior to 1972 there was no state statutory remedy analagous to § 10(b) or Rule 10b–5. The predecessor statute to § 410(a)(2) only provided a remedy relating to the sale of unregistered securities similar to § 12(*l*) of the Securities Act of 1933. *See* former Mass.Gen.Laws Ann. ch. 110A, §§ 6, 18. Section 410(a)(2) now provides:

(a) any person who ... (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission ... is liable....

Although this section does not forbid the use of one of a "manipulative or deceptive device or contrivance" as § 10(b) does, it prohibits the use of one of these devices in

---

adequately allege scienter for the purposes of Rule 9(b).

**6.** Since Section 410 was enacted two courts of the District of Massachusetts have followed *Janigan* and *Cook. Downey v. Vernitron Corp.,* 559 F.Supp. 1081 (D.Mass.1982) (Skinner, J.); *Kennedy v. Josephthal & Co., Inc.* [1982–1983 Trans-

fer Binder] Fed.Sec.L.Rep. (CCH) 91, 99, 187 (D.Mass. April 4, 1983) (Mazzone, J.).

In neither of these cases, however, is there any indication that those courts considered whether the cause of action provided by Section 410(a)(2) was more analagous to Section 10(b) and rule 10b–5 actions than to common law fraud actions.

language closely related to that of Rule 10b–5.

> it shall be unlawful for any person ... (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made not misleading....

17 C.F.R. § 240.10b–5. It seems clear that where the state law providing for an express private cause of action uses very similar language to prohibit the same conduct as the federal statute supporting an implied cause of action, i.e., fraud in securities transactions, and serves the same policy, i.e., preventing such fraud, the state statute is more analogous to the federal cause of action than common law fraud actions which are applicable to a wide variety of situations. *Abelson v. Strong*, 644 F.Supp. 524, 531–532, Civ. Action No. 85–0592–S, slip op. at 18–19. The majority of federal circuits that have considered the question have held that the applicable limitations period is that found in the state law specifically concerned with fraud and misrepresentation in the securities field. *E.g., Carothers v. Rice*, 633 F.2d 7, 13–15 (6th Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1702, 68 L.Ed.2d 199 (1981); *Forrestal Village Inc. v. Graham*, 551 F.2d 411, 413 (D.C.Cir.1977).

The plaintiffs contend that even if the applicable limitations period is the two year period provided in § 410(e), Count I as it pertains to transactions prior to February 4, 1984 should not be barred because the defendants fraudulent conduct constituted a "continuing wrong" from April of 1983 through approximately November of 1984 when the plaintiffs began transferring their accounts from Hutton. *Hamilton v. Smith*, 773 F.2d 461 (2d Cir.1985); *Ward v. Caulk*, 650 F.2d 1144 (9th Cir.1981). For the following reasons, I rule that second amended complaint alleges continuous unlawful behavior on the part of the defendants and, therefore, Count I to the extent that it alleges behavior violative of section 10(b) and Rule 10b–5 prior to February 4, 1984, is not time-barred.

A continuing violation sufficient to toll a statute of limitations is occasioned by continual unlawful acts on the part of the defendant. *Ward*, 650 F.2d at 1147. A statute of limitations does not begin to run on a continuing wrong "... till the wrong is over and done with...." *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir.1983); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir.1979); *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1979). In *Taylor*, the Court of Appeals for the Seventh Circuit explained that the continuing wrong principle strikes a balance between the plaintiff's interest in being spared the need to bring successive suits and the two distinct interests statutes of limitations serve: to reduce the error rate in legal proceedings by barring litigation over claims relating to the distant past and to give people the assurance that after a fixed time they can go about their business without fear of having their liberty or property taken through the legal process. *Taylor*, 712 F.2d at 1119.

Count I of the second amended complaint alleges a continuing course of fraudulent conduct by the defendants beginning with representations made to the plaintiffs at the April, 1983 meeting and continuing beyond February 4, 1984, into the statutory period. At the April, 1983 meeting Panos made a number of representations which the plaintiffs contend were knowingly or recklessly made, including representations that Panos had the ability and willingness to monitor daily the plaintiffs' accounts and the Panos would not allow interest charges to the plaintiffs' margin account in excess of $10,000 per year. According to the second amended complaint, the defendant Panos continued in a pattern of fraudulent and deceptive conduct throughout 1983 and into the beginning of 1984. As a result of his transferring funds from the plaintiffs' margin account to their commodity account and his purchase of calls with funds needed to cover the margin up to and through February, 1984, Panos allegedly began selling the plaintiffs' Computervision stock without disclosing to the plaintiffs' that he was doing so, even though he knew the

**838**

plaintiffs did not want to dispose of this stock, and contrary to Panos' representation to the plaintiffs that he would not allow the plaintiffs' margin account to reach a position where the plaintiffs' ownership of the Computervision stock would be jeopardized. The second amended complaint further alleges that in May and June of 1984 Panos transferred $24,000 from the margin account to the commodity account. Due to these transfers, the margin account allegedly again became short and Panos began selling short the stock in the account without informing the plaintiffs that he was doing so. From May, 1983 through September, 1983, the margin account allegedly incurred interest charges in the amount of $58,004.23.

Applying the doctrine of continuing wrong in this case also would not unduly frustrate the interests served by the statute of limitations. The events occuring between April, 1983 and February 4, 1984 were not so far in the past that there is much greater danger of error in litigating the plaintiffs' claims concerning these events than there would be in litigating the plaintiffs' claims with respect to events occurring after February 4, 1984. As to the concern that defendants have the assurance that after a fixed period of time they can go about their business without the fear of being sued, some of Panos's allegedly fraudulent behavior in handling the plaintiffs' accounts as discussed above, continued beyond February 4, 1984. Therefore, the defendants' uncertainty as to

whether they would be sued at all by the plaintiffs should have continued assuming, as the Court must, that the plaintiffs' allegations are true, at least up until February 4, 1986 when the plaintiff filed the original complaint.

## II. *The Commodity Exchange Act Claim*

■ Count VI of the second amended complaint alleges that the defendants violated § 4o of the Commodity Exchange Act, 7 U.S.C. § 6o ("CEA"),[7] when they recommended that the plaintiffs open a commodity account and purchase commodity futures contracts as investments. Defendants argue that their role in the financial transactions at issue was not as a "commodity trading advisor,"[8] but rather as a "futures commission merchant."[9] The anti-fraud section of the CEA makes it unlawful for commodity trading advisors, commodity pool operators, and associated persons to defraud any client. 7 U.S.C. § 6 o. The definition of commodity trading advisor, however, excludes those persons whose advisory role is "solely incidental to the conduct of their business." 7 U.S.C. § 2.[10] According to the defendants, brokerage houses like Hutton function more like futures commission merchants than as commodity trading advisors, and that, even if they did render investment advice to the plaintiffs, it was at best incidental to the conduct of their business. Plaintiffs allege facts sufficient to show that defendants' advisory role was more than solely inciden-

---

7. Section 4o of the Commodity Exchange Act, 7 U.S.C. § 6o, provides in relevant part:
    It shall be unlawful for any commodity trading advisor or commodity pool operator ...
    (A) to employ any device, scheme, or artifice to defraud any client ...; or
    (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client....
    7 U.S.C. § 6o.

8. A "commodity trading advisor" is defined as: " ... any person who, for compensation or profit, engages in the business of advising others ... as to the value of commodities or as to the advisability of trading in any commodity ... but does not include ... any floor broker or futures commission merchant, ... *Provided,*

That the furnishing of such services by the foregoing persons is solely incidental to the conduct of their business or profession."
7 U.S.C. § 2.

9. A "futures commission merchant" is defined as: " ... individuals, associations, partnerships, corporations, and trusts engaged in soliciting or in accepting orders for the purchase or sale of any commodity ... and ... accepts any money, securities, or property ... to ... secure any trades or contracts...."
7 U.S.C. § 2.

10. Neither plaintiffs nor defendants characterize defendants' role as that of a "commodity pool operator." 7 U.S.C. § 2.

tal to their business and therefore plaintiffs state a claim under § 4o of the CEA.

To support their argument, defendants rely primarily on *Markowitz v. Merrill Lynch, Pierce, Fenner & Smith,* 579 F.Supp. 124, 126–27 (S.D.N.Y.1984) where the court dismissed plaintiff's CEA § 4o claim on the ground that the complaint failed to allege that the defendants advised the plaintiffs within the meaning of the CEA. In *Markowitz,* the court ruled that Merrill Lynch was not a "commodity trading advisor" because it did not render investment advice that was more than merely incidental to the conduct of its business. *Markowitz,* 579 F.Supp. at 127. In that case, the plaintiff conveyed to his Merrill Lynch account executive an order to purchase silver futures contracts. It was not until after the account executive purchased another commodity by mistake that the plaintiff suffered financial loss. The court in *Markowitz* noted that, upon review of the complaint, there was evidence alleging that Merrill Lynch was a futures commission merchant, but there was no evidence alleging that Merrill Lynch advised the plaintiff as to the merits of the investment. *Id.* at 127.

■ A different pattern of activity emerges from review of the second amended complaint in this case. Plaintiffs assert numerous allegations that the defendants represented their advisory skills to be exemplary, suggested that plaintiffs open a commodity account and then recommended certain futures contracts for investment. Indeed, plaintiffs maintain that it was defendants' claimed investment advising skills, combined with assurances regarding Hutton's portfolio management policies, that encouraged the plaintiffs to hire the defendants. According to the plaintiffs,

the investment advice they received was central to the conduct of defendants' business and forms the basis for defendants' alleged violation of section 4o of the CEA. 7 U.S.C. § 6o.

Taking the plaintiffs' factual allegations as true, as a court must, *Miree v. DeKalb County, Georgia,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), plaintiffs' allegations are sufficient to state a claim under § 4o of the CEA, 7 U.S.C. § 6o.

### III. *The Racketeer Influenced and Corrupt Organization Act Claims*

Counts VII and VIII of the second amended complaint are asserted pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1964(c)[11] for defendants' alleged violation of RICO § 1962(c) and (d). RICO § 1962(c) makes it unlawful:

> ... for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).[12] RICO § 1962(d) makes it unlawful to conspire to violate any provision of § 1962, 18 U.S.C. § 1962(d).

In Count VI, plaintiffs complain that defendants Panos and Hutton violated RICO § 1962(c) when they conducted the affairs of an enterprise through a pattern of racketeering activity involving numerous alleged acts of mail fraud, wire fraud, violations of securities laws, and violations of federal commodities laws. In Count VII plaintiffs complain that defendants Hutton and Panos conspired together to violate

**11.** RICO § 1964(c) grants a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 ... [and such person] shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

**12.** Congress defines a "pattern of racketeering activity" as:

> ... at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity.

18 U.S.C. § 1961(5).

RICO § 1962(c) in violation of RICO § 1962(d).

Defendants urge the Court to dismiss these RICO claims for several reasons. Defendants first argue that, as to defendant Panos, plaintiffs fail to allege that he engaged in the requisite "pattern" of racketeering activity, 18 U.S.C. § 1961(5), because the alleged criminal acts fail to meet the "continuity plus relationship" test articulated by the United States Supreme Court in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* — U.S. ——, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). According to defendants, plaintiffs instead merely allege that Panos engaged in a single scheme to defraud them. Defendants next argue that, as to Hutton, plaintiffs fail to plead the existence of an "enterprise," [13] such that Hutton could be found liable under RICO § 1962(c). Defendants rely on several decisions, including a recent one from the First Circuit, *Schofield v. First Commodity Corporation of Boston,* 793 F.2d 28 (1st Cir.1986), where the court adopted defendant's argument that RICO requires that the "person" and the "enterprise" in a RICO § 1962(c) claim to be distinct and separate entities. Relying on this ruling, defendants argue that plaintiffs' claim is thus fatally deficient since it alleges that Hutton is both a person and a member of the association in fact consisting of Hutton and Panos. Finally, in response to plaintiffs' alternate assertion of *respondeat superior* liability against Hutton, defendants contend that the court in *Schofield,* 793 F.2d at 33, foreclosed the use of *respondeat superior* to find both the wrongdoer and the enterprise liable under RICO § 1962(c).

For the following reasons, that part of defendants' motion requesting dismissal of Count VII against defendant Panos should be denied and that part requesting dismissal of Count VII against defendant Hutton should be granted. The requested dismissal of Count VIII against both defendants should be denied because an alleged conspiracy is distinct from an alleged RICO violation, which, as to defendant Panos, is not dismissed. *Onesti v. Thomson McKinnon Securities, Inc.,* 619 F.Supp. 1262, 1266 (N.D.Ill.1985).

■ To properly state a claim for violation of RICO § 1962(c) plaintiffs must allege: 1) that a person; 2) conducted the affairs; 3) of an enterprise; 4) through a pattern of racketeering activity. 18 U.S.C. § 1962(c). As to defendant Panos, plaintiffs allege that he is a "person" within the meaning of RICO § 1961(3) and the "enterprise" he is alleged to conduct is Hutton. In the second amended complaint, plaintiffs describe in detail numerous and repeated predicate acts allegedly amounting to a pattern of racketeering activity. Specifically, plaintiffs point to alleged acts of mail fraud, wire fraud, as well as Securities Exchange Act and Commodity Exchange Act violations.

■ The Court in *Sedima,* 105 S.Ct. at 3285 n. 14, addressed the issue of the nature of the conduct required to establish a "pattern" under RICO. While the statute requires at least two acts to establish such a pattern, 18 U.S.C. § 1961(5), these two acts alone may be insufficient without the factor of "continuity plus relationship." *Id.* Sporadic criminal activity, even where there are more than two acts, does not necessarily constitute a pattern. *Id.* Assuming plaintiffs' factual allegations to be true, defendants repeated and related acts continued over a period in excess of fourteen months. In *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1354 (5th Cir.1985) the acts alleged to constitute a pattern took place within a five-month period; the court found the acts to be sufficiently related to meet the "continuity plus relationship" standard set forth in *Sedima.* Similarly, in *Graham v. Slaughter,* 624 F.Supp. 222 (N.D.Ill.1985) the court denied plaintiff's motion to dismiss defendants' RICO counterclaim for failure to allege the requisite pattern of activity. The court recognized

---

**13.** Congress defines "enterprise" as "... any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

that a pattern was properly pled because "a RICO claim must involve different criminal episodes, i.e., transactions 'somewhat separated in time and place' ... [and] an open-ended scheme may include a sufficient number of independent criminal episodes to satisfy the 'continuity' factor of *Sedima*." *Graham*, 624 F.Supp. at 225 (citations omitted). In this case, plaintiff alleges a sufficient number of related episodes, including telephone calls, letters and personal assurances, continuing over a sufficient period of time to satisfy the "continuity plus relationship" test established by the Court in *Sedima*.

As to defendant Hutton's RICO liability, plaintiffs allege that Hutton is the "person" and part of the "enterprise" that is designated as an association in fact consisting of Hutton and Panos. Although RICO permits an association in fact to be an enterprise, 18 U.S.C. § 1961(4), courts, including the First Circuit, have rejected the notion that Hutton could conduct the affairs of an enterprise of which it is also a member. *Schofield*, 793 F.2d at 30. In *Schofield*, the plaintiff claimed that brokers employed by the First Commodity Corporation of Boston ("FCCB") fraudulently induced her and her husband to invest in the commodity futures market. Among other claims against FCCB, plaintiff brought one based on RICO § 1962(c). In *Schofield*, the plaintiff alleged that the FCCB brokers were persons who conducted the affairs of an enterprise, designated to be FCCB, through a pattern of racketeering activity. *Schofield*, 793 F.2d at 30. The court ruled that the brokers could be found liable under RICO § 1962(c), but such liability could not be imposed upon FCCB because " ... [i]t is only a person, or one associated with an enterprise, not the enterprise itself, who can violate the provisions of the section." *Id.*, quoting *Van Schaick v. Church of Scientology of California*, 535 F.Supp. 1125, 1136 (D.Mass. 1982).

■ The statute requires a relationship between the person and the enterprise that in turn requires a separation between the two entities. Consequently, Hutton cannot be both the "person" and part of the enterprise or "association in fact" without stretching unnessarily the language of the statute. Although courts have disagreed regarding the interpretation of this section, *see, e.g., Nunes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 609 F.Supp. 1055, 1065 (D.Md.1985); *Minnesota Odd Fellows Home Foundation v. Engler & Budd Co.*, 630 F.Supp. 797, 800, n. 4, (D.Minn.1986), courts in the First Circuit interpret § 1962(c) to require a complete separation between the person and the enterprise. *Schofield*, 793 F.2d at 30–31; *Van Schaick*, 535 F.Supp. at 1136.

■ Defendants next argue that the use of principles of *respondeat superior* as an alternate basis for Hutton's liability is foreclosed by the decision in *Schofield*. The court in *Schofield*, ruling on a case involving similar claims and similar facts, stated that "[w]e think it inappropriate to use *respondeat superior* to accomplish indirectly what we have concluded the statute directly denies." *Schofield*, 793 F.2d at 63. The court's statutory interpretation in *Schofield* is in harmony with that of numerous other courts. *See, e.g., Intre Sport Ltd. v. Kidder, Peabody, Inc.*, 625 F.Supp. 1303, 1309 (S.D.N.Y.1985) (application of *respondeat superior* " ... accomplishes an end-run around the required distinction between 'enterprise' and violator of the statute ..."); *Parnes v. Heinold Commodities, Inc.*, 548 F.Supp. 20, 24 n. 9 (N.D.Ill.1982) (application of the civil law theory of *respondeat superior* would be " ... bizarre indeed as a means to warp the facts alleged in this case into the RICO mold."). Consequently, neither plaintiffs' RICO § 1962(c) claim, nor their assertion of vicarious liability against defendant Hutton, should be allowed to proceed to trial.

## IV. *The State Law Claims*

■ This Court declines to exercise pendent jurisdiction over the state law claims alleged in Counts II, III, IV, V, IX and X because plaintiffs have brought an action

in state court where those same claims are asserted.

Order accordingly.