**Nicholas T. FILLORAMO, Plaintiff,**

**v.**

**JOHNSTON, LEMON & CO., INC., and Robert H. Boorman, Jr., Defendants.**

**Civ. A. No. 87–1473.**

United States District Court, District of Columbia.

Oct. 25, 1988.

Steven J. Toll, Andrew N. Friedman, Cohen, Millstein & Hausfeld, Washington, D.C., for plaintiff.

Douglas K. Spaulding, John A. Beck, Daniel K. Steen, Lawrence G. Brett, Reed, Smith, Shaw & McClay, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

### (FILLORAMO II)

Plaintiff Nicholas T. Filloramo brings this action against defendants Johnston, Lemon & Co. Inc., a stock brokerage firm, and Robert H. Boorman, Jr., a Johnston Lemon employee who acted as Filloramo's stockbroker from August, 1982 until sometime in early 1986. Filloramo claims violations of section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, and brings common law counts of fraud and deceit, negligent misrepresentation, and breach of fiduciary duty. He also claims violations under "RICO", the Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. §§ 1962(a), (c) and (d). Defendants have moved for summary judgment on all counts.

In the Court's earlier Memorandum Opinion and Order of July 28, 1988, (Filloramo I) the Court granted defendants' motion for summary judgment as to plaintiff's claim under 18 U.S.C. § 1962(c), and conditionally denied defendant's motion for summary judgment as to the rest of plaintiff's RICO claims, as well as his federal securities law and common law claims, pending further briefing by the parties. The Court ordered further briefing as to application of the statute of limitations to plaintiff's non-RICO claims. For the reasons set forth below, the Court now grants in part defendants' motion for summary judgment as to plaintiff's non-RICO claims, and it orders the parties to provide further briefing as to the application of the statute of limitations to plaintiff's RICO claims.

FACTS

This action concerns 16 transactions over a three year period involving three stocks in plaintiff Filloramo's portfolio: Manor Care, Johnson Electronics and Megadata. In essence, Filloramo alleges that defendant Boorman first fraudulently induced him to sell his substantial holdings—approximately $240,000 worth—in Manor Care, and then fraudulently induced him to invest the proceeds in Johnson Electronics and Megadata. The scheme was motivated, under Filloramo's theory, by Johnston Lemon's twin desire to recoup $10,000 it gave Filloramo in settlement of an earlier, unrelated dispute, and also to push Johnson Electronics and Megadata stocks on its customers in the hope it would influence the two companies to hire Johnston Lemon as their investment banker.

In his complaint, Filloramo alleges that when he eventually sold his holdings in Johnson Electronics and Megadata, he suffered losses of over $60,000; in the meantime, Manor Care had more than doubled in value to over $600,000.

In the motion papers and discovery filed with the Court, the factual disputes are well defined (although somewhat hazily remembered by the principals). Filloramo contends that in late 1982, Boorman called to advise him that he should liquidate his substantial holdings in Manor Care, a company engaged in nursing care and related businesses. Boorman gave as a reason that the government had announced it would no longer reimburse nursing homes under its Medicaid program. Filloramo Deposition at 186–187. However, Manor Care had never significantly relied on Medicaid patients, and there was no reason to believe it would be adversely affected by a government cutback of such payments.

Further, Boorman was aware of this, or should have been, since this information was contained in Johnston Lemon reports in existence at the time.

Defendants for their part contend that Filloramo was also in possession and aware of the same information, since the same reports were sent to him on a regular basis. Further, although Boorman does not recall whether he advised Filloramo to sell his Manor Care holdings, Boorman Deposition at 54, he explicitly denies advising him to do so because of cutbacks in Medicaid reimbursements. *Id.* at 58.

In three sales in December, 1982, Filloramo liquidated most of his holdings in Manor Care, 8,000 shares, for approximately $240,000. He continued to trade in the stock, in much smaller quantities, until January, 1984.

Filloramo next alleges that sometime in 1983, he is not sure when but possibly in March, *see* Filloramo Deposition at 125, Boorman began to extol the prospects for Johnson Electronics. The tenor of his comments was that the company had a "pending" contract which would transform it into a $100 million company, and that such a contract was "imminent." As a result, Filloramo made an initial purchase of the stock in March, 1983. The contract never materialized.

Nevertheless, Filloramo continued to purchase Johnson Electronics, making two purchases in September, 1983, and three purchases some two years later in August, 1985. Joint Pretrial Statement, Stipulated Facts at 2. Before each purchase, Boorman allegedly repeated the same story about the pending $100 million contract, telling Filloramo he was now in contact with the president of the company, that it would be signed within two or three months, and explaining away the obvious fact it had not yet been signed as earlier promised because of a design change or other delay. Filloramo Deposition at 130–137. Filloramo invested a total of about $80,000 in Johnson Electronics, and claims losses of about $22,000 when he liquidated his holdings in the stock in 1986.

At his deposition, Boorman acknowledged recommending the stock to Filloramo, Boorman Deposition at 30, but he did not recall whether he made the representations alleged by Filloramo. *Id.* at 38. Defendants have produced no evidence that, if Boorman did make such representations, he had any basis for doing so.

The parties' respective stories about Megadata continue in this vein. Filloramo alleges that Boorman told him of illusory large contracts Megadata was about to obtain with companies throughout the airline industry, based on a super smart computer the company was developing for use in reservations programs. Boorman allegedly led Filloramo to believe that such contracts were a certainty, Filloramo Deposition at 173, and as with Johnson Electronics, they would happen "very shortly." *Id.* at 168–169. Based on this, Filloramo began purchasing Megadata in January, 1983. And as with Johnson Electronics, he continued to purchase the stock, buying in June and October, 1983, in February, June, and July, 1984, and in February, 1985, Joint Pretrial Statement, Stipulated Facts at 2–3, always pursuant to the same representations by Boorman about contracts with airline companies in the "very, very near future ... in a few months; years would not interest me." Filloramo Deposition at 166–173. And as with Johnson Electronics, before each purchase of Megadata Filloramo adamantly trusted Boorman's representations that although the upcoming contracts had been delayed temporarily, they were now about to materialize. Over the two year period, Filloramo alleges he invested approximately $100,000 in Megadata, and when he sold out in 1986 he took a loss of about $41,000.

Boorman on the other hand, while agreeing he did recommend that Filloramo purchase Megadata, Boorman Deposition at 42–43, denies he represented that contracts throughout the airline industry were a certainty, or even that there was a good chance they would occur. *Id.* at 143.

Basic to Filloramo's version of events is that he reposed great and undaunted trust in Boorman, and continued to rely on the

information he received from his broker because of the pressures of running his own business. *See, e.g.,* Filloramo Deposition at 136–137. Defendants counter that Filloramo was an active and sophisticated investor, and that the 16 transactions contested here represent a small portion of the roughly 200 transactions that Johnston Lemon brokered for him over a 10 year period. Filloramo Deposition, Exhibit 7.

DISCUSSION

I. *Statute of Limitations*

A. The Common Law Claims: Accrual

The parties have agreed that the three year statute of limitations under 4 D.C. Code Ann. § 12–301(8) (1981) is the applicable period for all of plaintiff's common law claims. *King v. Kitchen Magic, Inc.,* 391 A.2d 1184, 1186 (D.C.1987) (fraud); *Riddell v. Riddell Washington Corp.,* 680 F.Supp. 4, 10 (1987) (breach of fiduciary duty, where plaintiff seeks money damages); *Prouty v. National R.R. Passenger Corp.,* 572 F.Supp. 200, 206 (D.D.C.1983) (negligence). Under § 12–301(8), the three year limitation period begins to run "from the time the right to maintain the action accrues." Since Filloramo filed this suit on May 28, 1987, all his common law claims that accrued by May 28, 1984 are barred, absent equitable tolling.

In determining when Filloramo's common law claims "accrued" for statute of limitations purposes, two separate issues must be addressed. First, Filloramo's claims are based on several transactions occurring over a three year period, some of which fell within the limitations period while some did not. The Court must therefore determine whether to regard each transaction separately in applying § 12–301(8), or whether they should be taken as a whole. Secondly, injuries suffered as a result of stock transactions take time to develop. Since injury as well as wrongful conduct must be present for a cause of action to accrue, *Weisberg v. Williams, Connolly & Califano,* 390 A.2d 992, 994 (D.C.1978), the Court must determine *how much* injury is sufficient for the common

law causes of action to accrue, and then determine *when* such injury occurred. For the reasons set out below, the Court finds that each transaction should be regarded separately before applying the statute of limitations. Further, the Court finds that sufficient injury occurred prior to May 28, 1984, resulting from the transactions that occurred prior to that date, for Filloramo's claims on those transactions to have accrued by that date.

■ When a lawsuit is based on wrongful conduct continuing over a period of time, a plaintiff can ordinarily recover only for damages resulting from that wrongful conduct which occur within the statutory period. *See, e.g., Hanover Shoe, Inc. v. United States Machinery Corp.,* 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 2236 n. 15, 20 L.Ed.2d 1231 (1967) *reh'g denied, Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 393 U.S. 901, 89 S.Ct. 64, 21 L.Ed.2d 188 (1968) and accompanying text. However, under the "continuing tort" doctrine a plaintiff can recover for all damages resulting from all of defendant's wrongful conduct, provided any of it occurred within the statutory period. The parties have not cited, and the Court has not found any local law applying the doctrine; however, it has been applied by the federal court of appeals here. *Page v. United States,* 729 F.2d 818 (D.C.Cir.1984).

In *Page,* the plaintiff sued the Veteran's Administration under the Federal Tort Claims Act for subjecting him to harmful drugs during a course of treatment from 1961 to 1980, claiming severe physical and mental injury. 729 F.2d at 819. The Court held that his claims arising prior to 1972 were barred by *res judicata,* based on an earlier adjudication. 729 F.2d at 821. But Page was not barred from bringing a claim for the eight years of treatment from 1972 until 1980, despite the two years limitation period.[1] 729 F.2d at 821. Said the Court, "We view the injury claimed by Page as gradual, resulting from the cumulative impact of years of allegedly tortious drug

---

1. Similarly to § 12–301(8), the applicable statute of limitations in *Page* began to run when the

cause of action "accrues." *Page,* 729 F.2d at 820.

treatment. To us it seems unrealistic to regard each prescription of drugs as the cause of separate injury, or as a separate tortious act triggering a new limitation period." 729 F.2d at 822–823.[2]

■ The present case is distinguishable. Filleramo's sale of Manor Care in December, 1982 involved 8,000 shares worth over a quarter of a million dollars. Further, each purchase of Johnson Electronics and Megadata involved at least 1,000 shares, costing at least $7,750 and often much more. The harm resulting from each separate transaction is measured in the thousands of dollars, and therefore it would appear they should be analyzed separately for statute of limitation purposes. *See Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 128 (7th Cir.1972) (employees' eleven purchases of employer's stock regarded by Court as independent transactions for statute of limitations purposes, since if purchases were alleged in separate counts of civil complaint, recovery could be had as to each; or if listed as separate counts in criminal indictment, conviction could be had as to each).

Nonetheless, Filloramo cites two cases in support of applying the continuing tort doctrine here, *Gaudette v. Panos*, 644 F.Supp. 826 (D.Mass.1986), *modified on other grounds*, 650 F.Supp. 912 (1987), *rev'd on other grounds*, 852 F.2d 30 (1988), and *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983) (Posner, J.). However, it appears that *Gaudette* should more properly have been decided on the ground that defendant concealed plaintiffs' cause of action. *See* 644 F.Supp. at 829–831, 837–838. *Taylor*, on the other hand, was an action for copyright infringement, and its holding that plaintiff could collect for damages on infringing sales occurring prior to the limitations period appears to be at odds with a Court of Appeals decision here. *Underwater Storage, Inc. v. United States Rubber Co.*, 371 F.2d 950, 955 (D.C.Cir.1966) (plaintiff could recover in trade secret misappropriation case where original acquisition occurred prior to limitations period, for subsequent usage so long as such usage occurred within the limitations period).

Therefore, since each transaction here resulted in significant injury to Filloramo, the Court will analyze each separately for determining when the statute of limitations began to run. In particular, the Court will focus on the sale of Manor Care stock in late 1982, and the purchases of Johnson Electronics and Megadata Stocks occurring prior to May 28, 1984.[3]

■ The second inquiry in determining whether Filloramo's causes of action based on these transactions accrued by May 28, 1984, is to determine whether he suffered sufficient injury by that date. To determine when Filloramo began to suffer injury, the Court will begin with the record of his monthly statements from Johnston

---

**2.** It should be noted that courts will frequently say they are regarding a defendant's conduct as a "continuing tort" or "continuing wrong," but wind up applying the rule in *Hanover Shoe, Inc., supra. See Underwater Storage, Inc. v. United States Rubber Co.*, 371 F.2d 950 (D.C.Cir.1966), discussed *infra*, p. 576. The thrust of such cases is to allow a plaintiff to sue for damages that occur after the wrongful conduct has technically ceased, in cases where defendant continues to profit from the original wrong through subsequent behavior that is otherwise innocent. However, the plaintiff's recovery is limited to damages incurred within the statutory period, and not those suffered before then.

**3.** Filloramo's purchases were as follows:

Johnson Electronics:

| | | |
|---|---|---|
| March 9, 1983 | 2,000 shares at 10.75 = | $21,500 |
| September 14, 1983 | 1,000 shares at 9.125 = | $ 9,125 |
| September 23, 1983 | 2,000 shares at 9 = | $18,000 |

Megadata:

| | | |
|---|---|---|
| January 24, 1983 | 1,000 shares at 12.375 = | $12,375 |
| June 2, 1983 | 1,000 shares at 13.375 = | $13,375 |
| October 25, 1983 | 1,000 shares at 11.25 = | $11,250 |
| February 24, 1984 | 1,000 shares at 10 = | $10,000 |

Lemon. Filloramo Deposition Exhibit 2. They show the market prices for Johnson Electronics and Megadata from the time he first purchased them under Boorman's counsel. In addition, they show the market price of Manor Care from the time of his late 1982 sell off through October, 1983, as well as January, 1984, the date of the last monthly statement on which the stock appears.[4]

The records show that Filloramo suffered substantial injury by May 1984 from the Manor Care and Johnson Electronics stock transactions. By September, 1983 the adjusted price of Manor Care was about 75% greater than his December, 1982 selling price of approximately $30 per share; his lost profits therefore amounted to about $175,000. Although the price dropped sharply in October and was still down the following January, it was still significantly higher than when Filloramo sold off over a year earlier. The data from the twelve monthly statements listing Manor Care's price after the sale show lost profits ranging from about $41,000 to over $180,000, on an investment worth about $240,000 at the time of liquidation.

His paper losses in Johnson Electronics, while far less dramatic, were nonetheless substantial. By September, 1983, he was holding 5,000 shares at an average purchase price of almost $10 per share; by October, 1983, the price had fallen to 6.5 and for the next six months varied from 5.5 to 8.25. The monthly statements revealed paper losses on the stock ranging from about $7,500 to over $20,000, on an investment of about $50,000.

Filloramo likewise suffered paper losses on his Megadata holdings prior to May 28, 1984. By November, 1983, he held 3,000 shares at an average price of just over $12 per share. By January, 1984, the price fell substantially until May, with Filloramo's paper losses going from some $3,000 to about $12,000, on an investment of roughly $37,000. Further, his final purchase of 1,000 shares of Megadata in February, 1984 lost value immediately and continually through May of that year.

These injuries are sufficient to begin the statute of limitations running on all transactions prior to May 28, 1984. *Fitzgerald v. Seamans*, 553 F.2d 220, 227 (D.C.Cir. 1977) (plaintiff need not have suffered all injury to which he will ultimately fall prey, the Court stating "The fact of injury was sufficiently plain for [plaintiff's] cause of action to accrue even though the extent and precise nature of the injury had not yet developed.")

**4.** The market prices are as follows. The prices for Manor Care are adjusted, in parenthesis, to compensate for two stock splits that occurred during the period. The figures in parentheses are the ones that should be compared to the 29.5 price at which Filloramo sold off the bulk of his holdings in Manor Care.

| Date | | Manor Care | | Johnson Electronics | Megadata |
|------|------|------------|----------|---------------------|----------|
| November | 1982 | 29.75 | | | |
| December | 1982 | 36 | | | |
| January | 1983 | 34.625 | | | |
| February | 1983 | 34.75 | | | 12.25 |
| March | 1983 | 29.25 | (43.875) | 10.875 | 10.5 |
| April | 1983 | 26 | (39) | 12.75 | 11.75 |
| May | 1983 | 28.5 | (42.75) | 13.875 | 13 |
| June | 1983 | 30.125 | (45.19) | 12.25 | 14.5 |
| July | 1983 | 22.5 | (50.625) | 8.25 | 13 |
| August | 1983 | 20.25 | (45.56) | 8.25 | 11 |
| September | 1983 | 23.125 | (52.03) | 7.75 | 13 |
| October | 1983 | 17 | (38.25) | 6.5 | 11.25 |
| November | 1983 | | | 5.5 | 12.25 |
| December | 1983 | | | 5.5 | 12.25 |
| January | 1984 | 18.75 | (42.19) | 7.5 | 11.25 |
| February | 1984 | | | 7.5 | 10 |
| March | 1984 | | | 8.25 | 9.5 |
| April | 1984 | | | 7.25 | 8.25 |
| May | 1984 | | | 7 | 8.75 |

Filloramo Deposition Exhibit 2

## B. The Common Law Claims: Equitable Tolling

■ Of course, the determination that Filloramo's cause of action on the common law claims based on the transactions prior to May 28, 1984 accrued by that date does not end the inquiry. It must also be the case that he knew or that he reasonably should have known of the facts giving rise to his cause of action, since the running of the statute will be tolled until this occurs. *King v. Kitchen Magic, Inc.*, 391 A.2d 1184, 1186 (D.C.1978). Note, the burden of proof is on plaintiff to prove equitable tolling, once accrual of the cause of action is established. *Clift v. UAW*, 818 F.2d 623, 629 (7th Cir.1987), and cases cited therein.

It seems clear enough, and Filloramo does not appear to deny, that he reasonably should have been aware of his injury by May 28, 1984. The facts showing that he was suffering injury, set out *supra*, are taken from the monthly statements he received from Johnston Lemon. As a matter of law, he is charged with knowledge of their contents unless for some reason they were difficult for him to interpret. *See Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984). The monthly statements plainly list all stocks in which he held an interest, and in particular those at issue here for the months listed in footnote 4, *supra*. In addition, the prices reproduced in footnote 4 are clearly listed in a column on the monthly statement form labeled "market price," except for the prices listed in October, 1983 and January, 1984 for Manor Care, and those prices reflect his actual transactions in the stock.

The only other possible difficulty might be with Manor Care, which split—three for two—twice during the period set out in the footnote, so that by the July, 1983 statement the listed price per share would have to be multiplied by a factor of 9/4 in order to equate it with the price per share in December, 1982. But Filloramo does not claim any difficulty in understanding this, or that he failed to realize that the value of this investment in Manor Care stock would have substantially increased in 1983 had he held it. Further, the monthly statements showed more than just price per share; they also showed total number of shares, and total market value, which further removed any ambiguity about the changing value of Manor Care stock. Thus, as a matter of law, the Court finds Filloramo should reasonably have been aware of injury by May 28, 1984.

Filloramo contends vigorously, however, that he was not aware and that he reasonably should not have been aware of Boorman's wrongful conduct. His argument is based essentially on the doctrine that continuing reassurances by a stockholder to his client will toll the running of the statute of limitations in an action for fraud or mismanagement.

To begin with, argues Filloramo, he and Boorman had a fiduciary relationship, which the case law recognizes may exist between a stockbroker and client. *Moholt v. Dean Whitter Reynolds, Inc.*, 478 F.Supp. 451, 453 (D.D.C.1979). In particular, Filloramo placed great trust and reliance on Boorman's counsel and advice, since Filloramo was much too busy with the conduct of his own business to investigate the stocks he invested in. Although information that Manor Care would not be harmed by government cutbacks in Medicare funding was readily available to Filloramo, he did not read it, but rather trusted Boorman's representations that Manor Care would be harmed. *Richards v. Mileski*, 662 F.2d 65, 71 (D.C.Cir.1981). (aggrieved party need not proceed from the outset as if he were dealing with thieves).

In addition, Boorman's continuing assertions that the promised contracts for Johnson Electronics and Megadata were pending, or imminent, just two to three months away despite the delays, amounted to continuing assurances that concealed the fact that Boorman had no basis for the predictions he was making. *William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C. 1980) (defendant cannot avail himself of statute of limitations where he has done anything to lull plaintiff into inaction), *Vucinich*, 739 F.2d at 1436 (broker's reassurances to client regarding concerns rele-

vant to the alleged misrepresentation may toll statute of limitations). Therefore argues Filloramo, the statute was tolled until May, 1986, when his new broker at Johnston Lemon informed him that Johnson Electronics and Megadata were "dogs," causing Filloramo to begin the inquiry that led to this lawsuit.

■ However, Filloramo's argument must fail. While it is certainly true that a customer is entitled to place great trust and reliance in his stockbroker, and that he may sue upon its breach, the customer's trust may not be blind for purposes of tolling the statute of limitations. *Hupp v. Gray,* 500 F.2d 993, 996 (7th Cir.1974). It is not required that Filloramo regard Boorman from the outset of their relationship as a "thief;" but at the same time the statutory period will not await his "leisurely discovery of the full details of the alleged scheme." 500 F.2d at 996. The substantial drop in Johnson Electronics and Megadata stock prices, and also the rise in value of Manor Care, were not concealed from Filloramo but rather were clearly and painfully revealed by Johnston Lemon's monthly statements. 500 F.2d at 966–967 (when plaintiff made final purchases of stock at $47 per share, having been told it might go to $75, his suspicions should have been aroused when it fell to $17.50).

■ While a broker's continuing assurances might toll the running of the statute even in the presence of a falling market, they will not always do so. What distinguishes Boorman's assurances about Johnson Electronics and Megadata was their quality of self expiration. According to Filloramo, Boorman did not merely profess to know *what* would happen, but also *when.* The lucrative contracts were not only certain to happen, but they were going to happen soon, within two to three months, or were even pending. By February, 1984 or so, Filloramo had heard this three times about Johnson Electronics and another three times about Megadata; meanwhile their prices continued to stagnate and then decline. Thus, Filloramo needed to undertake no independent research to verify the representations were wrong; by May 28, 1984 they were each proved wrong merely by the passage of time.

The case law appears to distinguish those situations where assurances contain, or are made in the context of, a time limit. In *Hupp v. Gray, supra,* the defendant stock broker had not only told the plaintiff that the price of a stock might go from $47 to $75, but that it might do so "at an early date." "Even a wholly unsophisticated investor should have realized in March, 1967 —when the market price had fallen to $17.50 rather than rising to $75—the existence of facts sufficient to precipitate into his consciousness a geographical paraphrase of the somewhat hackneyed remark of Marcellus to Haratio." 500 F.2d at 996 (the Court citing W. Shakespeare, Hamlet, Prince of Denmark, Act I, Scene IV, 90).

A similar distinction was apparent in *General Builders Supply Co. v. River Hill Coal,* 796 F.2d 8 (1st Cir.1986). There, investors in a coal mining joint venture were originally told that mining operations would begin in March, 1979, one year after their investment in the project. However, as problems arose, investors were given continuing (and misleading) assurances by the president of the venture manager corporation, as well as by a broker in whom they had developed great trust over a number of years. Nonetheless, the Court held that the statute of limitations began running in March, 1979. "[I]t behooved the investors to look beyond the personal assurances of these two persons," especially where information about the project was readily available to them. 796 F.2d at 13. The Court found that the investors had "ample warning" prior to the first day of the applicable limitation period for two reasons.

First, almost a year and a half had passed since the one year estimated delay date on which mining was to begin, and upon which the financial projections were based. This alone should have alerted them to the fact that something was amiss. Second, River Hill had failed to obtain mining permits or insurance, and had not begun any development

work on the actual mining site. 796 F.2d at 13.

The present case strikes this Court as presenting quite similar problems for Filloramo. First, by May 28, 1984, over a year had passed since Boorman's first alleged misrepresentations about highly lucrative contacts for Johnson Electronics and Megadata that would be signed "shortly," or in "two to three months." Second, such prospective contracts had not even been mentioned in the Johnston Lemon literature on the two companies that was not only available to Filloramo, but was being sent to him. Third, the prices of the two stocks remained stagnant for some period of time after Filloramo first purchased them under Boorman's advice, and then began a significant decline.

In addition, the value of Manor Care stock substantially increased from the time Filloramo sold most of his holdings at Boorman's urging in December, 1982. Although Boorman's alleged misrepresentations about Manor Care did not have the same sort of time element as his assurances regarding the other two stocks, Filloramo's testimony seems to indicate Boorman urged him to sell his Manor Care stock by the end of 1982 in order to avoid the supposed adverse impact of government cutbacks in Medicare spending. Filloramo's Deposition at 186–188. Such urgency, together with the lack of any adverse impact to the stock as much as a year and a half later, was sufficient to alert Filloramo to the possibility of misrepresentation—especially when his monthly statements showed the company was prospering.

What distinguishes this case from *Hupp* and *General Builders Supply* is that Boorman allegedly repeated his assurances regarding contracts for Johnson Electronics and Megadata, complete with the representations they would be signed soon, despite the fact that the previous such assurances had been proven false by events. To illuminate the significance of that, this Court would turn, not to Shakespeare, but to an old Scottish saying.[5]

## C. The Federal Securities Law Claim

Filloramo's claims under section 10(b) and Rule 10b–5 are governed by the shorter two year limitation period contained in 3 D.C.Code Ann. § 2–2613(e) (1981) (formerly, § 2–2413(e)). *Wachovia Bank & Trust Co. v. Nat. Student Marketing Co.*, 650 F.2d 342, 346 (D.C.Cir.1980), *cert. denied*, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981). In addition, the accrual problems present under § 12–301(8) are not present here; the two year limitation period begins to run from the date of the contract for sale. Therefore, Filloramo's federal securities law claims on all transactions that occurred before May 28, 1985 are barred.

## D. The RICO Claims

Filloramo's RICO claim is governed by the four year statute of limitation contained in 15 U.S.C. § 15b (1982). *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). Therefore, Filleramo's RICO claims are timely for all transactions that occurred after May 28, 1983. However, in light of the foregoing discussion, the status of those transactions prior to that date is not clear. Therefore, the parties will be ordered to submit further briefing on whether Filloramo can recover under his RICO cause of action for those transactions that occurred prior to May 28, 1983.

It is therefore,

ORDERED, that defendant is awarded summary judgment as to plaintiff's common-law claims which are based on any transactions occurring prior to May 28, 1984, and such claims are dismissed; and it is further

ORDERED, that defendant is awarded summary judgment as to plaintiff's federal securities law claims which are based on any transactions occurring prior to May 28, 1985, and such claims are dismissed; and it is further

ORDERED, that the parties shall submit further briefing on whether plaintiff may

---

**5.** "Fool me once, shame on you. Fool me twice, shame on me." Scottish author unknown.

recover damages under his RICO claims for any transactions that occurred more than four years prior to the date he filed suit. Defendants' supplemental memorandum should be filed within 10 days, with plaintiff's supplemental response within 10 days thereafter.

SO ORDERED.